**IN THE SUPREME COURT OF MISSISSIPPI**
**NO. 98-KA-00322-SCT**

*LEVON BROOKS a/k/a LEE V. ROBINSON a/k/a "TYTEE"*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/22/1992 |
| TRIAL JUDGE: | HON. JOHN M. MONTGOMERY |
| COURT FROM WHICH APPEALED: | NOXUBEE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | CURTIS H. AUSTIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: PAT S. FLYNN |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/7/1999 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 10/28/99 |

## BEFORE PITTMAN, P.J., WALLER AND COBB, JJ.

## PITTMAN, PRESIDING JUSTICE, FOR THE COURT:

### STATEMENT OF THE CASE

¶1. On September 15, 1990, three-year-old Courtney Smith was abducted from the bed she shared with her two sisters. She was found murdered two days later. Courtney's five-year-old sister, Ashley, identified Levon Brooks as the person who took Courtney from the bed. Brooks was convicted of the capital murder of Courtney. He was sentenced to life imprisonment in the custody of the Mississippi Department of Corrections.

### STATEMENT OF FACTS

¶2. In the early morning hours of September 15, 1990, three-year-old Courtney Smith was taken from her bed. Two days later, Courtney was found dead in a pond near her home in Noxubee County.

¶3. Levon "Tytee" Brooks, an ex-boyfriend of Courtney's mother, was convicted of Courtney's murder after Ashley Smith, Courtney's five-year-old sister, identified Brooks as the man who took Courtney from their bed. Ashley could see Brooks in the light of the television coming from the next room.

¶4. Immediately after Brooks left the house with Courtney, Ashley tried unsuccessfully to awaken the only adult in the house, her Uncle Tony. When the other adults finally arrived home the next morning and found

Courtney missing, they began a search. The police were finally called in at 8 p.m., and an official search was begun. Courtney had not been found when the search was called off at 1 a.m. Courtney's body was found later that morning in a pond about 100 yards from her home.

¶5. Sgt. Ernest Eichelberger, chief investigator for the Noxubee County Sheriff's Department, testified that Courtney's body showed bleeding from her head and vaginal area. He interviewed Ashley, who told him "Tytee" had taken her sister. Ashley then identified Brooks from a photo lineup.

¶6. Dr. Stephen Hayne testified that the autopsy he performed showed drowning to be the cause of death. He testified that bruises found on Courtney's head were probably from a fist. He further testified that he found cuts in her vaginal wall and a torn hymen, injuries that occurred while she was alive.

¶7. Dr. Hayne also found bite marks on Courtney's wrist. Dr. Michael West, a forensic odontologist, was called in to examine the bite marks. Dr. West gave extensive testimony regarding the tests he had conducted in reaching the conclusion that the bite marks had been made by Brooks. Brooks' expert, Dr. Harry Mincer, testified that while he could not say with medical certainty that Brooks made the bite marks, neither could he exclude Brooks as the biter.

¶8. Brooks was convicted of capital murder. He was sentenced to life in prison.

## STATEMENT OF THE ISSUES

**I. THE TRIAL COURT ERRED IN ADMITTING THE TESTIMONY OF DR. MICHAEL WEST INTO EVIDENCE.**

**II. THE TRIAL COURT ERRED IN NOT GRANTING APPELLANT'S MOTION FOR A MISTRIAL BASED ON THE FACT THAT THE STATE FAILED TO FURNISH TO THE DEFENDANT ALL OF THE EVIDENCE THE STATE'S EXPERT WITNESS USED IN ARRIVING AT HIS CONCLUSION.**

**III. THE TRIAL COURT ERRED IN DENYING BROOKS' MOTION TO SUPPRESS THE EYEWITNESS IDENTIFICATION OF ASHLEY SMITH, A FIVE-YEAR-OLD.**

**IV. THE TRIAL COURT ERRED IN ALLOWING PICTURES OF COURTNEY SMITH INTO EVIDENCE.**

**V. THE VERDICT WAS AGAINST THE OVERWHELMING WEIGHT AND SUFFICIENCY OF THE EVIDENCE.**

**VI. THE TRIAL COURT ERRED IN INSTRUCTING THE JURY THAT THEY MUST REACH A UNANIMOUS VERDICT.**

**VII. THE TRIAL COURT ERRED IN OVERRULING BROOKS' MOTION FOR A MISTRIAL BASED ON A 10-2 VOTE BY THE JURY.**

## DISCUSSION OF LAW

**I. THE TRIAL COURT ERRED IN ADMITTING THE TESTIMONY OF DR. MICHAEL WEST INTO EVIDENCE.**

¶9. Brooks asserts that the trial court erred in admitting the testimony of Dr. Michael West, a forensic odontologist, into evidence. Dr. Steven Hayne, who performed an autopsy on Courtney, testified that he found what appeared to be bite marks on Courtney's wrist. He then stated that he contacted Dr. West because he, himself, had no expertise in bite-mark identification.

¶10. At trial, the State offered Dr. West as an expert in the subject of forensic odontology. Brooks, after briefly questioning Dr. West, made no objection to Dr. West being designated an expert. Because there was no contemporaneous objection made at trial, this issue is procedurally barred. However, because of the controversial nature of bite-mark evidence, this Court will address the issue on the merits.

¶11. This Court has never affirmatively stated that bite-mark evidence is admissible in Mississippi. It has intimated that such expert testimony regarding bite-mark evidence will be allowed:

> Because the opinions concerning the methods of comparison employed in a particular case may differ, it is certainly open to defense counsel to attack the qualifications of the expert, the methods and data used to compare the bite marks to persons other than the defendant, and the factual and logical bases of the expert's opinions. Also, **where such expert testimony is allowed by the trial court**, it should be open to the defendant to present evidence challenging the reliability of bite-mark comparisons. State v. Ortiz, 198 Conn. 220, 502 A.2d 400, 403 (1985). Only then will the jury be able to give the proper weight, if any, to this evidence.

*Howard v. State*, 701 So.2d 274, 288 (Miss. 1997) (emphasis added). We now take the opportunity to state affirmatively that bite-mark identification evidence is admissible in Mississippi.

¶12. Dr. West outlined the procedures he used in determining that Brooks made the bite marks found on Courtney's wrist. He testified that he excised the portion of skin containing the bite marks. He then took the dental casts of twelve people, including Sonja Smith, Courtney's mother, and Brooks. Dr. West then photographed the skin portion and compared the molds he had made to the photographs, effectively eliminating everyone except Brooks as suspects.

¶13. As this Court stated in *Howard*, when bite-mark evidence is allowed, the defense will be allowed " . . . to attack the qualifications of the expert, the methods and data used to compare the bite marks to persons other than the defendant, and the factual and logical bases of the expert's opinions." *Howard,* 701 So.2d at 288. If expert testimony regarding bite-mark evidence is allowed by the trial court, the defense should be given the opportunity to present evidence that challenges the reliability of bite-mark comparisons, as was done in the case *sub judice*. *Id.*

¶14. Brooks accepted Dr. West as an expert in forensic odontology. Brooks further cross-examined Dr. West on the field of odontology. In an attempt to challenge the reliability of bite-mark comparisons, Brooks brought out that there are no established guidelines in evaluating bite-mark evidence. He also brought out that the American Dental Association recognizes the field of forensic odontology but does not view it as a specialty.

¶15. Brooks called Dr. Harry Mincer as his expert in forensic odontology. Dr. Mincer testified that he used the same procedures as Dr. West in examining the bite-mark evidence. Dr. Mincer also testified that while he could not say with medical certainty that Brooks made the bite marks found on Courtney, he **did find consistencies** between the mold of Brooks' teeth and the bite marks on Courtney. Dr. Mincer further

testified on cross-examination that he could **not** exclude Brooks as the biter and that, in his opinion, he could exclude the teeth from the other persons tested as the ones that had inflicted the bite marks in question.

¶16. Dr. Mincer noted that Dr. West had taught him how to interpret bite marks and that he used basically the same procedures as Dr. West in evaluating the bite marks. These admissions by Dr. Mincer, including his testimony that he could not specifically exclude Brooks as having made the bite marks, made it difficult to challenge the reliability of the bite-mark evidence.

¶17. Brooks was given the opportunity to challenge the reliability of the bite-mark evidence as required by *Howard*. The trial court did not abuse its discretion in admitting Dr. West's testimony. This issue is without merit.

### II. THE TRIAL COURT ERRED IN NOT GRANTING APPELLANT'S MOTION FOR A MISTRIAL BASED ON THE FACT THAT THE STATE FAILED TO FURNISH TO THE DEFENDANT ALL OF THE EVIDENCE THE STATE'S EXPERT WITNESS USED IN ARRIVING AT HIS CONCLUSION.

¶18. Brooks argues that the trial court erred in not granting a new trial based on the fact that the State failed to furnish the defense expert, Dr. Mincer, with all evidence that the State's expert, Dr. West, used in arriving at his conclusion that Brooks made the bite marks found on Courtney's wrist. Specifically, Brooks alleges that Dr. Mincer did not receive the molds made of Sonja Smith's teeth, the mold made of Brooks' lower teeth, or the black and white photographs that had been made by Dr. West.

¶19. Brooks is procedurally barred from bringing the issue of missing photographs before this Court. In his motion for mistrial, Brooks did not assign as error the failure to provide the black and white photographs. He only assigns as error the failure of Dr. West to provide the defense expert with the molds of Sonja Smith and the lower mold of Brooks.

¶20. The State correctly contends that Brooks is alleging a discovery violation as a result of Dr. West misplacing the lower mold of Brooks and the molds of Sonja Smith. As this Court has stated in the past, the purpose of discovery is to avoid unfair surprise or trial by ambush. *Ghoston v. State*, 645 So.2d 936, 939 (Miss. 1994); *Rogers v. State*, 599 So.2d 930, 937 (Miss. 1992); *McCaine v. State*, 591 So.2d 833, 836 (Miss. 1991); *Fuselier v. State*, 468 So.2d 45, 56 (Miss. 1985). "This State is committed to the proposition that these conflicting interests are best accommodated and that justice is more nearly achieved when, well in advance of trial, each side has reasonable access to the evidence of the other." *Box v. State*, 437 So.2d 19, 21 (Miss. 1983). However, "[t]he party alleging a discovery violation 'must affirmatively request it on pain of waiver.'" *McCaine*, 591 So.2d at 836 (quoting *Middlebrook v. State*, 555 So.2d 1009, 1011 (Miss. 1990)).

¶21. Brooks claims that the failure of Dr. West to provide molds to Dr. Mincer warrants a mistrial. Brooks failed to make a demand on the State for the missing molds until his cross-examination of Dr. West at trial. As such, he has waived the right to claim a discovery violation. Procedural bar notwithstanding, we will address the issue on the merits.

¶22. The record clearly shows that the attorneys for Brooks received notice that Sonja Smith's molds, as well as the lower mold of Brooks, were missing. Brooks' attorneys received a letter from Dr. Mincer dated

October 28, 1991, in which he forwarded a copy of his "Medicolegal Opinion." This "Medicolegal Opinon" contained an itemized list of the evidence he received. Dr. Mincer noted in his opinion that the pair of molds marked "9" was missing and that only the maxillary mold of Brooks was included in the evidence.

¶23. Brooks received this letter, and hence notice of the missing molds, some three months before trial. At no time prior to trial did Brooks make a demand on the State to produce the missing molds. Brooks' failure to make a demand for discovery serves to waive his right to protest. This issue is without merit.

### III. THE TRIAL COURT ERRED IN DENYING BROOKS' MOTION TO SUPPRESS THE EYEWITNESS IDENTIFICATION OF ASHLEY SMITH, A FIVE-YEAR-OLD.

¶24. Brooks next alleges that the photographic lineup where he was identified by Ashley Smith as the person who took Courtney was impermissibly suggestive, thereby rendering any subsequent in-court identification unreliable. This assignment of error is without merit.

¶25. Brooks filed a motion to suppress the photo identification made by Ashley Smith. A hearing was held where the photographs were admitted into evidence. The trial court subsequently entered its order denying the motion to suppress.

¶26. This Court has stated:

> The standard of review for suppression hearing findings in a matter of pretrial identification cases is whether or not substantial credible evidence supports the trial court's findings that, considering the totality of the circumstances, in-court identification testimony was not impermissibly tainted. . . .The appellate review should disturb the findings of the lower court 'only where there is an absence of substantial credible evidence supporting it.'"

*Ellis v. State*, 667 So.2d 599, 605 (Miss. 1995) (citations omitted). This Court then reiterated that the *Biggers* factors, established in *Neil v. Biggers*, 409 U.S. 188, 199 (1972), are to be evaluated in order "to determine whether the in-court identification is 'sufficiently reliable to overcome the taint of the prior improperly attained identification.'" *Ellis*, 667 So.2d at 605 (quoting *Gayten v. State*, 595 So.2d 409, 418 (Miss. 1992)). The *Biggers* factors are:

(1) the opportunity of the witness to view the accused at the time of the crime;

(2) the degree of attention exhibited by the witness;

(3) the accuracy of the witness' prior description of the criminal;

(4) the level of certainty exhibited by the witness at the confrontation;

(5) the length of time between the crime and the confrontation.

*Ellis*, 667 So.2d at 605 (quoting *Fleming v. State*, 604 So.2d 280, 302 (Miss. 1992)). If the trial judge evaluates the identification according to these factors and finds that the in-court identification is not impermissibly tainted, this Court will disturb the findings only if there is no substantial, credible evidence supporting the findings. *Ellis*, 667 So.2d at 605 (citing *Ray v. State*, 503 So.2d 222, 223-24 (Miss. 1986)).

¶27. In his order dated January 8, 1992, the trial judge found that the photo identification by Ashley Smith was not impermissibly suggestive even though there were minor differences in the photographs:

The Supreme Court of the State of Mississippi addressed the issue of whether such minor differences in the photographs would, in fact, create an impermissible suggestion in Jones v. State, 504 So.2d 1196 (1976). In that case, the defendant was the only one in an array of seven photographs who was wearing a cap. His was the only picture in which there was a measuring device, and his picture was slightly larger than the other six. The Supreme Court held that although there might be a suggestion of impermissibility, such minor differences did not constitute an "impermissible suggestion."

The only genuine issue in this case (State v. Brooks) is that the length of the defendant's hair is greater than that of [the others]. . . .

Following the analysis in Jones, there may very well be some suggestion of impermissibility. The Court held that this was not so impermissible as to give rise to a substantial likelihood of misidentification.

The Court, having considered same, is of the opinion that although there might be a slight suggestion of impermissibility in the use of the photograph of the defendant in which his hair is longer than the others depicted, nonetheless, nothing about the photographic array nor the procedure used, gives rise to a substantial likelihood of misidentification.

In addition, the Court relies upon the case of Pool v. State, 216 So.2d 425, wherein the Court held that if there is an independent source for the intrajudicial identification, this is generally sufficient to remove the "taint" of any alleged primary illegality from improper and suggestive pretrial photographic identification procedures.

In regard to the Motion to Suppress, the Court makes the following findings of fact:

1. That the photographic lineup was a pre-indictment lineup.

2. The Court finds that all photographs were of men of the approximate age of the defendant.

3. The Court finds that they have the same type of facial hair and are all black.

4. The Court does find there is a difference in that the length of the defendant's hair is longer than those of the other photographic exhibits.

5. The Court finds there were no external suggestions made by any law enforcement officers to the witness, Ashley Smith, encouraging her to select any of the particular suspects.

6. The Court finds that the witness, Ashley Smith, made her selection free of any undue influence of any type from the investigating officers.

7. The Court further finds that the witness, Ashley Smith, based upon her statement, knew the defendant prior to the alleged commission of the offense.

8. The Court further finds that the witness related that the defendant had gone to school with the witness's mother at Riley College, and further that the witness, Ashley Smith, had known the defendant's son, Travis, and that they played together.

The Court further concludes that the witness, Ashley Smith, had an independent source of knowledge about the identification of the defendant, and pursuant to Wade and Poole, this further removed any taint of alleged impermissibility and suggestive photographic identification procedures.

¶28. While there may have been a hint of impermissibility, it was shown that Ashley Smith had an independent source of knowledge regarding the identification of Brooks. Sgt. Eichelberger testified at trial that before Courtney's body was found, Ashley told him that "Tytee" had taken her sister.

¶29. Ashley immediately picked Brooks out of the photo lineup even though the picture used was several years old. This Court has ruled that the use of an older picture, even where the defendant's appearance had changed, would not unreasonably taint a lineup. *Wilson v. State,* 574 So.2d 1324, 1326-27 (Miss. 1990). That is exactly what occurred in the case *sub judice*.

¶30. Ashley identified Brooks as the perpetrator of the crime before Courtney's body had been found. Brooks offers no proof as to why Ashley would accuse him falsely, nor does Brooks present this Court with the allegedly suggestive photo lineup. As we stated in *Smith v. State*:

> ...[I]t is the duty of the appellant to see that the record of trial proceedings wherein error is claim[ed] is brought before this Court.

*Smith v. State*, 572 So.2d 847, 849 (Miss. 1990) (citing *Walker v. Jones County Community Hosp.,* 253 So.2d 385 (Miss. 1971)). Because we are unable to review the photographs, we defer to the trial judge in his ruling. We must accept the trial court's careful analysis of the factors set forth in *Jones.* As such, this issue is without merit.

### IV. THE TRIAL COURT ERRED IN ALLOWING PICTURES OF COURTNEY SMITH INTO EVIDENCE.

¶31. It is well settled in this state that the admissibility of photographs rests within the sound discretion of the trial judge. *Westbrook v. State*, 658 So.2d 847, 849 (Miss. 1995) (citing *Griffin v. State*, 557 So.2d 542 (Miss. 1990)); *see also Mackbee v. State*, 575 So.2d 16, 31 (Miss. 1990); *Boyd v. State*, 523 So.2d 1037, 1039 (Miss. 1988). Photographs that are gruesome or inflammatory or that lack an evidentiary purpose are inadmissible as evidence. *McNeal v. State*, 551 So.2d 151, 159 (Miss. 1989). The decision of the trial judge will not be disturbed absent a showing of an abuse of discretion. *Westbrook*, 658 So.2d at 849 (citing *Herring v. State*, 374 So.2d 784, 789 (Miss. 1979)); *see also Cabello v. State*, 471 So.2d 332, 341 (Miss. 1985). The discretion of the trial judge "runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." *Westbrook*, 658 So.2d at 849 (quoting *Hart v. State,* 637 So.2d 1329, 1335 (Miss. 1994) (citations omitted)).

¶32. In his brief, Brooks makes general allegations that the photographs were presented with the sole purpose to inflame the jury and that the trial judge abused his discretion in admitting the photographs. Brooks offers no evidence or supporting proof to show that he was prejudiced in any manner from the introduction of the photographs. He further fails to explain how the judge abused his discretion in admitting the photographs in question.

¶33. In *Brown v. State*, 690 So.2d 276, 289 (Miss. 1996), this Court stated:

In *Westbrook v. State*, 658 So.2d 847, 849 (Miss. 1995), this Court found that photographs of a victim have evidentiary value when they aid in describing the circumstances of the killing, *Williams v. State*, 354 So.2d 266 (Miss. 1978); describe the location of the body and cause of death, *Ashley v. State*, 423 So.2d 1311 (Miss. 1982); or supplement or clarify witness testimony, *Hughes v. State*, 401 So.2d 1100 (Miss. 1981).

¶34. In the case *sub judice*, the two photographs allowed into evidence were examined by the trial judge. The judge found the photographs to be more probative than prejudicial, stating that they corroborated the underlying felony of sexual battery. Further, Sgt. Eichelberger testified that the photographs showed the condition in which Courtney's body was found. Under the standards set forth in *Brown*, the photographs were properly admitted into evidence. As such, this assignment of error is without merit.

### V. THE VERDICT WAS AGAINST THE OVERWHELMING WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

¶35. Brooks next contends that the verdict was against the overwhelming weight and sufficiency of the evidence. After the State rested its case, Brooks made a motion for a directed verdict, which was denied by the trial court. Brooks then offered evidence in his own defense.

¶36. A motion for directed verdict challenges the legal sufficiency of the evidence offered to that point of trial to sustain a guilty verdict. Following the denial of his motion for directed verdict, Brooks offered evidence in his own defense, thereby waiving challenge to the sufficiency of the State's evidence up to that point in time. *Bailey v. State*, 729 So.2d 1255, 1263 (Miss. 1999); *Stringer v. State*, 557 So.2d 796, 797 (Miss. 1990).

¶37. This, however, does not preclude Brooks from challenging the weight or sufficiency of the evidence to sustain the judgment against him. *Id.* (citations omitted) All evidence is examined by this Court in determining its sufficiency. *Id.* As we noted in *Bailey*,

> When on appeal one convicted of a criminal offense challenges the legal sufficiency of the evidence, our authority to interfere with the jury's verdict is quite limited. We proceed by considering all of the evidence-not just that supporting the case for the prosecution-in the light most consistent with the verdict. We give [the] prosecution the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point in favor of the accused with sufficient force that reasonable men could not have found beyond a reasonable doubt that he was guilty, reversal and discharge are required. On the other hand, if there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict of guilty is thus placed beyond our authority to disturb.

*Bailey* at 1263, (quoting *McFee v. State*, 511 So.2d 130, 133-34 (Miss. 1987) (citations omitted)).

¶38. Brooks was brought to trial under an indictment charging him with capital murder with the underlying felony being sexual battery. Miss. Code Ann. § 97-3-19(2)(e) (1972). Sexual battery is defined as engaging in sexual penetration with a child under 14 years of age. Miss. Code Ann. § 97-3-95 (1972). In order to be convicted of capital murder with the underlying felony of sexual battery, it must be proven that Brooks engaged in some kind of sexual penetration with a victim under the age of 14.

¶39. As evidenced by State's Exhibits 2 and 3, it is clear that the victim, Courtney Smith, was a child under the age of 14. Ruby Smith, the victim's grandmother, testified that Courtney was three at the time of her death.

¶40. Dr. Hayne testified that when performing an autopsy on the victim, he found cuts and abrasions in the child's vaginal area, which were consistent with penetration of an object, such as a finger or penis. He then testified that the child's hymen had been torn, which was also indicative of penetration. In addition, Sgt. Eichelberger testified that the victim was bleeding from the vaginal area when her body was found, further evidencing the sexual battery. Both Dr. Hayne and Sgt. Eichelberger identified State's Exhibits 2 and 3, photographs taken of the victim that showed the vaginal bleeding. From the testimony at trial and the photographs offered into evidence, it is clear that the victim was sexually battered.

¶41. The State must next connect Brooks to the sexual battery and murder. The State offered into evidence the testimony of Ashley Smith, Courtney's sister, who identified Brooks as the one who took Courtney from their bed. Sgt. Eichelberger also testified that Ashley told him that Brooks was the person who took Courtney from their bed.

¶42. The State offered into evidence the testimony of Dr. Michael West, a forensic odontologist. Dr. West testified that he made dental molds of all the adults who had been in contact with Courtney on the day of her death, in an attempt to eliminate as many suspects as possible. He then testified that the bite marks found on Courtney's wrist were made by Brooks. Dr. Mincer, Brooks' expert, testified that he found consistencies between the bite-mark and the mold of Brooks' teeth and that he could not exclude Brooks as the biter.

¶43. The eyewitness identification of Brooks as the one who took Courtney from her bed, coupled with the identification of the bite marks on Courtney's wrist as belonging to Brooks, are sufficient to place the jury's verdict out of this Court's reach. While the defense did offer an alibi defense, the discrepancies between the State's case and that of the defense were properly left for the jury. As such, this issue is without merit.

### VI. THE TRIAL COURT ERRED IN GRANTING INSTRUCTION C-11 THEREBY INFORMING THE JURY THAT THEY MUST REACH A UNANIMOUS VERDICT.VII. THE TRIAL COURT ERRED IN OVERRULING BROOKS' MOTION FOR A MISTRIAL BASED ON A 10-2 VOTE BY THE JURY.

¶44. Because issues VI and VII are based on the granting of Instruction C-11, they will be addressed together.

¶45. Brooks alleges that the trial court erred in granting Instruction C-11. Instruction C-11 instructed the jury that it must reach a unanimous verdict. A careful review of the record shows that Brooks made no contemporaneous objection to such instruction. As such, issue VI is procedurally barred. However, in addressing issue VII, this Court must briefly address the trial court's action in granting Instruction C-11.

¶46. After deliberating several hours, the jury reported it had reached a verdict. The verdict, upon examination by the trial judge, was found to state that the jury "was irreconcilably divided and unable to return a verdict." The trial judge asked for a numerical division, without reference to guilt or innocence, and was told 10-2. He then recessed for the night.

¶47. The next morning, Brooks requested a mistrial based on the fact that the jury was unable to reach a

verdict the night before. In his motion for mistrial, Brooks' attorney stated that the jury had returned with a written verdict stating that the jury was irreconcilably deadlocked.

¶48. The Court denied the motion stating that the jury had only been deliberating three hours, not an unreasonably long period of time for a trial on a capital offense. The judge then stated that he would reread Instruction C-11, which was approved by this Court in *Sharplin v. State*, 330 So.2d 591, 596 (Miss. 1976). After rereading the instruction to the jury, the jury deliberated another 3½ hours before returning a guilty verdict.

¶49. Brooks alleges that it was error for the Court to deny his mistrial. In *Sharplin*, this Court stated:

> We hold therefore that the mere request and receipt of the jury's numerical division without reference to guilt or innocence does not coerce the jury and is not error. We believe that the possibility of coercion, if any, lies in the trial judge's conduct and comments after he receives the division, that is, whether the judge merely affords the jury additional time to deliberate or whether he attempts to force a verdict by suggestive comments or coercive measures.

*Sharplin*, 330 So.2d at 596.

¶50. The trial judge in the case *sub judice* asked for a numerical division without regard to guilt or innocence. He received the division, 10-2, and then ordered the jury to stop deliberations for the night. He told them they would be called back in the morning to continue deliberations. Nothing in the record indicates that the judge acted in a coercive or suggestive way. He merely stated what would happen the next morning when the jury was called back. This issue is without merit.

## CONCLUSION

¶51. We affirm Brooks' conviction for capital murder and his life sentence. This Court can find no error to warrant reversal. Therefore, based on the above and foregoing reasons, the judgment of the trial court is affirmed.

¶52. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRIS0NMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED**.

**SMITH, MILLS, WALLER AND COBB, JJ., CONCUR. SMITH, J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER AND COBB, JJ. BANKS, J., CONCURS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN, P.J., AND WALLER, J. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION. PRATHER, C.J., NOT PARTICIPATING.**

**SMITH, JUSTICE, CONCURRING:**

¶53. I concur with the majority view that bite-mark evidence is now admissible in this state. I have long espoused that view, but have previously been unable to convince a majority of this Court that we should

adopt this view. *See **Banks v. State**, 725 So.2d 711, 718-20 (Miss. 1998)(Smith, J., dissenting); **Howard v. State**, 701 So. 2d 274, 287-93 (Miss. 1997)(Smith, J., dissenting).* I have also noted that in ***Harrison v. State***, 635 So. 2d 894 (Miss. 1994), this Court had the opportunity to rule that bite-mark evidence was admissible, but did not do so. This, in spite of holding that "the lower court erred in failing to provide expert witnesses, both in pathology and odonatology, to the defendant." ***Howard***, 701 So. 2d at 293 (Smith, J. , dissenting). Having so noted in these previous dissents, I write further here in support of the majority view, to simply point out the extent of the universal acceptance by our courts nationwide of the admissibility of bite-mark evidence.

¶54. Bite-mark evidence has been repeatedly accepted as scientific evidence and held to be admissible. ***Handley v. State***, 515 So. 2d 121, 130 (Ala. Crim. App. 1987)(forensic odonatologist testimony admissible as evidence is in the nature of physical comparisons as opposed to scientific tests or experiments); ***State v. Richards***, 804 P.2d 109, 111 (Ariz. Ct. App. 1990)(a ***Frye*** hearing is not required where bite-mark evidence is presented by a qualified expert); ***Verdict v. State***, 868 S.W.2d 443, 447 (Ark. 1993)(bite-mark evidence is not novel scientific evidence and was relevant and reliable, ***People v. Marsh***, 441 N.W.2d 33, 36 (Mich. Ct. App. 1989)(general reliability of bite-mark evidence as a means of positive identification is sufficiently established that a court is authorized to take judicial notice of reliability without conducting hearing on same); ***State v. Armstrong***, 369 S.E.2d 870, 877 (W.Va. 1988)(reliability of bite-mark evidence is sufficiently established that a court is authorized to take judicial notice of same); ***State v. Stinson***, 397 N.W.2d 136, 140 (Wis. Ct. App. 1986)(bite-mark identification evidence presented by an expert witness can be a valuable aid to a jury in understanding and interpreting evidence). *See also **Chase v. State***, 678 P.2d 1347 (Alaska Ct. App. 1984); ***People v. Marx***, 126 Cal. Rptr. 350 (Cal. Ct. App. 1975); ***State v. Ortiz***, 502 A.2d 400 (Conn. 1985); ***Mitchell v. State***, 527 So. 2d 179 (Fla. 1988); ***Bundy v. State***, 455 So. 2d 330 (Fla. 1984); ***Smith v. State***, 322 S.E.2d 492 (Ga. 1984); ***People v. Shaw***, 664 N.E.2d 97 (Ill. App. Ct. 1996); ***People v. Milone***, 356 N.E.2d 1350 (Ill. App. Ct. 1976); ***Niehaus v. State***, 359 N.E.2d 513 (Ind. 1977); ***State v. Peoples***, 605 P.2d 135 (Kan. 1980); ***State v. Vital***, 505 So.2d 1006 (La. Ct. App. 1987); ***Commonwealth v. Cifizzari***, 492 N.E.2d 357 (Mass. 1986); ***State v. Hodgson***, 512 N.W.2d 95 (Minn. 1994); ***State v. Sager***, 600 S.W.2d 541 (Mo. Ct. App. 1980); ***Bludsworth v. State***, 646 P.2d 558 (Nev. 1982); ***People v. Bethune***, 484 N.Y.S.2d 577 (N.Y. App. Div.1984); ***State v. Green***, 290 S.E.2d 625 (N.C. 1982); ***State v. Hill***, 595 N.E.2d 884 (Ohio 1992); ***State v. Routh***, 568 P.2d 704 (Or. Ct. App. 1977); ***Commonwealth v. Henry***, 569 A.2d 929 (Pa. 1990); ***State v. Adams***, 481 A.2d 718 (R.I. 1984); ***State v. Jones***, 259 S.E.2d 120 (S.C. 1979); ***State v. Cazes,*** 875 S.W.2d 253 (Tenn. 1994); ***Spence v. State***, 795 S.W.2d 743 (Tex. Crim. App. 1990); ***Harward v. Commonwealth***, 364 S.E.2d 511 (Va. Ct. App. 1988); ***State v. Howe***, 386 A.2d 1125 (Vt. 1978); ***State v. Warness***, 893 P.2d 665 (Wash. Ct. App. 1995).

¶55. Two additional states imply that bite-mark evidence would be admissible, but hold that a ***Frye*** hearing should be held prior to admission of such evidence. ***Fishback v. People***, 851 P.2d 884 (Colo. 1993); ***Bloodworth v. State***, 512 A.2d 1056 (Md. 1986).

¶56. The majority view is correct and long overdue. The U.S. Supreme Court recent decisions of ***Kumho Tire Co. v. Carmichael**, 119 S. Ct. 1167 (1999); **General Elec. Co. v. Joiner**, 522 U.S. 136 (1997); **Daubert v. Merrell Dow Pharms., Inc**., 509 U.S. 579 (1993)* stress that the federal district courts must be gatekeepers on the admission of expert testimony. I am confident that our learned trial judges will properly determine, on a case-by-case basis, whether an expert may testify to certain matters if the proper procedures are followed by the parties seeking the admission of such expert's testimony. I am equally

persuaded that our juries are quite capable to determine what weight and credibility to give to the expert witness and his testimony.

## WALLER AND COBB, JJ., JOIN THIS OPINION.

BANKS, JUSTICE, CONCURRING IN PART:

¶57. I concur in the result reached by the majority. With respect to bite-mark evidence, I reach that result by application of the procedural bar. Because Brooks failed to object we need not discuss the question whether the particular opinions rendered by Dr. West in this case should have been admitted.

¶58. Much is made of the question whether we should say that bite-mark evidence is admissible. The short answer is that it depends. Some bite-mark opinions may be admissible while others may not be. It helps no one, in my view, and it is perhaps misleading to make blanket pronouncements concerning evidence. Our precedents speak for themselves. As with all expert opinions proffered, the trial court confronted with an offer of bite-mark evidence will have to examine that proffer in context, including, but not limited to, the qualifications of the expert before it, the examination conducted, and the specific opinions proffered. That is what and all that *Howard* said and all, in my view, that needs to be said. *Howard v. State*, 701 So. 2d 274, 288 (Miss. 1997).

## SULLIVAN, P.J., AND WALLER, J., JOIN THIS OPINION.

## McRAE, JUSTICE, DISSENTING:

¶59. The majority takes the opportunity to conclude once and for all that forensic ondontology evidence is universally admissible, essentially the same as fingerprints and DNA testing, and is permissible in Mississippi regardless of the quality of that evidence and regardless of the fact that the proponent of that evidence claims that two indentations are teeth marks unique to one person in the world. This is done despite the fact that the discipline is without any universal criteria or methodology. I dissent because, not only do I have qualms about proclaiming that bite-mark evidence is admissible to specifically identify a person and exclude everyone else, I also have reservations about Michael West's unmatched ability to conclude that no one other than the defendant could have produced the marks on the deceased especially where, as here, other experts are unwilling to testify that the marks could **only** be bite marks and not something else.

¶60. I recognize that a majority of courts taking up this issue have ruled that bite-mark evidence is admissible. Nonetheless, as pointed out in Faigman, Kaye, Saks & Sanders, Modern Scientific Evidence: The Law and Science of Expert Testimony, § 24-1.0, at 156 (West 1997), courts that have admitted bite-mark evidence have done so despite the fact that forensic odontologists "were more doubtful about whether the state of their knowledge permitted them to successfully accomplish the challenging task of identifying a perpetrator 'to the exclusion of all others.'" The admission by the courts of this testimony "apparently convinced the forensic odontology community that, despite their doubts, they really were able to perform bite mark identifications." *Id.* at 157-58. Notwithstanding the fact that the experts themselves were sorely divided over whether a defendant could be uniquely identified on the basis of his teeth marks, courts routinely held that such disagreements went to the weight of the evidence rather than its admissibility. *Id.* at 161.[1]

¶61. Thus, courts routinely admit bite-mark evidence even though there are many areas in forensic bite-

mark identification about which there is still disagreement among its practitioners. *Id.* § 24-2.3 at 178.<sup>(2)</sup> One of these areas, and a not insignificant one, is what constitutes a bite mark. *Id.* at 180. In the instant case, Brooks's expert testified that he could not be certain that the marks, consisting of only "two linear marks", were human bite marks. They "could have been made by any number of things", Dr. Mincer opined. Dr. West, of course, testified that with the aid of ultraviolet light he was able to identify marks that could have been made by nothing other than Brooks's teeth.

¶62. This is not the first time that Dr. West has been able to boldly go where no expert has gone before. In *Harrison v. State*, 635 So.2d 894, 897 (Miss. 1994), West testified that the victim's body was covered in teeth marks inflicted by the defendant. On appeal, Dr. Mincer gave an affidavit to the effect that the marks appeared to be ant bites. In *Davis v. State*, 611 So. 2d 906, 910 (Miss. 1992), West concluded that "the wound was a bite mark consistent with having been inflicted approximately three weeks previously." But Dr. Richard Souviron, a forensic odontologist from Miami, Florida, "testified that the wound on Davis' arm was not a bite mark, but even if it were, it was inconsistent with Mrs. Davis' teeth."

¶63. West's propensity for testifying with a confidence seen in no other expert has been documented by Paul Gianelli in *The Abuse of Scientific Evidence in Criminal Cases: The Need for Independent Crime Laboratories*, 4 Va. J. Soc. Pol'y & Law 439 ( 1997). *See also* Marcia Coyle, "Expert" Science Under Fire in Capital Cases, Nat'l L.J., July 11, 1994, at A23. Gianelli presents the following summaries:

A. State v. Maxwell

In State v. Maxwell, a capital murder case, West testified that a butcher knife blade "indeed and without doubt" caused skin wounds on two victims and a slash mark on a door. Moreover, the broken handle of the knife "indeed and without doubt" caused bruises on the accused's hand. This testimony was virtually the only evidence connecting Maxwell to the murders. West used alternate light imaging (which he somewhat immodestly dubbed the "West Phenomenon") to detect and analyze the wounds. He testified that this phenomenon, which he was unable to photograph, was a generally accepted scientific technique. Nevertheless, the three experts, who West claimed used his procedure, later testified that this was not so. Maxwell's attorney, John Holdridge of the Mississippi and Louisiana Capital Trial Assistance Project, filed complaints about West with professional organizations. An ethics committee of the American Academy of Forensic Sciences [AAFS] concluded that West had "misrepresented data in order to support his testimony" and that the term "indeed and without doubt" was unwarranted. Similarly, an ethics committee of the American Board of Forensic Odontologists [ABFO] concluded that West had "materially misrepresented the evidence and data." It also concluded that the "West Phenomenon" was not "founded on scientific principles" and that West had presented testimony "outside the field of forensic odontology." Finally, the Crime Scene Certification Board of the International Association of Identification [IAI] concluded (but only by a majority) that there was a basis for the complaint and provided West with an opportunity to relinquish his "Senior Crime Scene Analyst" certification.<sup>(3)</sup>

B. State v. Oppie

In another capital case, State v. Oppie, Dr. West conducted a fingernail/scratch-mark comparison, reporting that "indeed and without doubt" the scratches on the accused were made by the victim's fingernails. He acknowledged, however, that he had failed to make test marks with the fingernail, to evaluate the scratch's class and individual characteristics, and to establish the reproducibility of such

marks.

## C. State v. Keko

In still another capital murder case, Dr. West made a bite-mark identification, after exhuming a corpse fourteen months after death. Once again, he used his blue light ("West Phenomenon") technique to visualize the wound, which he then matched to the defendant's teeth. The skin tissue surrounding the mark was removed and placed in a preservative. Two weeks later, however, the preservative had erased the mark. The defendant is serving a life term.

## D. Other Cases

West estimates that he has testified about fifty-five times over the past decade. A third to one half of these cases were capital prosecutions, and he has only "lost" one case. In 1992, West matched a bite mark found on a rape victim with the teeth of Jonny Bourn, a positive identification, but DNA analysis of skin taken from fingernail scrapings of the victim conclusively excluded Bourn. In other cases, West identified a footprint on a murdered girl's face, matched a bruise on a murder victim's stomach with a hiking boot belonging to the victim's mother, and testified as a burn pattern specialist.

¶64. The instant case went to trial in January, 1992. This was several years before West began to encounter difficulties with the AAFS, ABFO and IAI and, thus, this evidence, which casts serious doubts as to West's credibility, was not before the jury in this case.

¶65. It is also worth mentioning that West seems to have difficulty in keeping up with evidence. In the instant case, he lost the not only the mold to Brooks's lower teeth but also the mold of another suspect's teeth. In *Banks v. State*, 725 So.2d 711, 715-16 (Miss. 1997), this Court was forced to reverse where West testified that the defendant's teeth correlated to marks in a sandwich left at the crime scene but failed to preserve the sandwich so that the defense could make its own comparisons.

¶66. Furthermore, West's opinion that "it could be no one else but Levon Brooks that bit this girl's arm" was rendered despite the fact that the wound was comprised of a mere two indentations. As a general rule, the more teeth registered on the wound, the better the comparison. De La Cruz, *Forensic Dentistry and the Law: Is Bite Mark Evidence Here to Stay?*, 24 Am. Crim. L. Rev. 983, 1005 n.7 (1987) (citing Rawson, Vale, Sperber, Herschaft & Yfantis, *Reliability of Scoring System of the American Board of Forensic Odontology for Human Bite Marks*, 31 J. Forensic Sci. 1235, 1238-39 (1986)); See also Faigman et al., Modern Scientific Evidence at 174. Even West admitted that the typical bite mark consists of indentations made by six teeth.

¶67. This Court's apparent willingness to allow West to testify to anything and everything[4] so long as the defense is permitted to cross-examine him may be expedient for prosecutors but it is harmful to the criminal justice system. I believe it is time we did a careful analysis of bite mark testimony - especially that coming from Dr. West - now rather than later or we risk having West become the Ralph Erdmann[5] of Mississippi with the attendant consequence of having to reexamine every case in which West has ever testified.

¶68. Therefore, because I believe the introduction of West's testimony was reversible error, I dissent.

1. See, e.g., *People v. Milone*, 356 N.E.2d 1350 (Ill. App. Ct. 1976).

2. Faigman et al. list the following areas as those lacking a consensus in the community of forensic odontologists: 1. The timing of the bite mark injury; 2. Enhancement procedures and techniques (note that in this case, West testified that he used ultraviolet light to enhance the wound enabling him to find "several unique marks" that corresponded to the flaws on the back side of Brooks's teeth; this technique is what allowed West to be positive that only Brooks could have made the two indentations); 3. The type of material for test bites or the accuracy of test bites under various mockup conditions; 4. The pressure necessary to produce the various levels of tissue injury under normal and unusual circumstances has not been reliably measured; 5. Manipulation of various types of distortion to produce correction; 6. The problem faced by forensic dentists today is not necessarily one of matching the bite mark to a set of teeth. It is demonstrating whether another set of teeth could have produced the same or similar mark; 7. There is not universal agreement on which injuries are bite mark related; 8. Research on the minimum number of points of concordance or the minimum number of teeth marks needed in a bite mark for certainty is not as well established as the uniqueness of the dentition. Faigman, et al. § 24-2.3 at 178-80.

3. West's testimony in the *Maxwell* case was the cover story in the February, 1996 ABA Law Journal. "Out of The Blue", 82 A.B.A.J. 50 (Feb. 1996), described West as the "dental equivalent of now discredited footprint expert Louise Robbins." West was also profiled by Marcia Coyle, in "Expert" Science Under Fire in Capital Cases, Nat'l L.J., July 11, 1994, at A23.

4. A Westlaw search reveals that Michael West is apparently the only person testifying about the "science" of "wound pattern analysis". *Puckett v. State*, 737 So.2d 322 (Miss.1999); *Giles v. State*, 650 So.2d 846 (Miss. 1995). In *State v. Van Winkle*, 658 So. 2d 198, 200 (La. 1995) (overturning conviction), the court noted that: "[ot]her forensic evidence was provided by Dr. West, a dentist and controversial 'wound pattern analyst' from Hattiesburg, Mississippi. He testified that markings on Patrick's stomach were consistent with the soles of tennis shoe hiking boots seized from Patricia's bedroom. A defense expert, Dr. Singer, contested this, finding there was no reasonable correlation between Patrick's bruise pattern and the boot in Patricia's room."

5. Ralph Erdmann was a Texas pathologist who faked autopsies. Erdmann's misconduct was discovered only when he listed the weight of a deceased's spleen in an autopsy report. The deceased's relatives were puzzled since they knew that the deceased's spleen had been removed years before. Paul Gianelli, *The Abuse of Scientific Evidence in Criminal Cases: The Need for Independent Crime Laboratories*, 4 Va.J.Soc.Pol'y & Law 439 at 449-50 (1997). In another case, Erdmann reported that a man found dead in a dumpster had died of pneumonia and hypothermia. A second autopsy showed that the deceased had died from a bullet wound to the head. Erdmann Faces New Legal Woes, 81 A.B.A. J. 32 (1995).