913 So.2d 371 (2005)
Michael COCHRAN, Appellant,
v.
STATE of Mississippi, Appellee.
No. 2003-KA-01859-COA.
Court of Appeals of Mississippi.
April 19, 2005.
*372 Richard B. Lewis, Clarksdale, attorney for appellant.
Office of the Attorney General by Deirdre McCrory, attorney for appellee.
Before BRIDGES, P.J., IRVING and MYERS, JJ.
BRIDGES, P.J., for the Court.
¶ 1. A jury sitting before the Coahoma County Circuit Court found Michael Cochran guilty of armed robbery, attempted armed robbery and aggravated assault. The circuit court sentenced Michael to two fifty-year terms and one twenty-year term. Additionally, the circuit court set the three *373 sentences to run concurrent to one another. Following his trial, Michael filed unsuccessful motions for directed verdict, judgment notwithstanding the verdict, and a new trial. Aggrieved, Michael appeals and requests resolution of the following issues:
I. DID THE COURT ERR IN FAILING TO GRANT THE DEFENDANT'S ALIBI INSTRUCTION.
II. DID THE COURT ERR IN OVERRULING DEFENDANT'S MOTION TO SUPPRESS THE PHOTOGRAPHIC LINE-UP.
III. DID THE COURT ERR IN FAILING TO ALLOW THE DEFENDANT TO INTRODUCE EVIDENCE OF AN ALLEGED CONFESSION BY AN UNAVAILABLE WITNESS TO ONE OF THE CRIMES FOR WHICH THE DEFENDANT WAS CHARGED.
Finding no error, we affirm.

Facts
¶ 2. The facts of this case center around the early morning hours of June 17, 2002. Around 2:00 a.m., Leon Collins got an order to go from Kemp's restaurant in Clarksdale, Mississippi. After Collins got his food, he left Kemp's and went to get into his car. A man armed with a pistol stopped Collins. Collins began to run, but stopped and put his hands in the air when he heard the gunman fire a shot. The gunman stuck the pistol in Collins's face and demanded Collins's wallet. Collins threw his wallet on the ground. The gunman picked Collins's wallet up and left the scene. Collins's wallet reportedly contained about forty-five dollars. Collins went to the Clarksdale Police Department and reported the events to Officer Barry Smith and Investigator Robbie Linley. Collins identified the gunman as "one of the Cochran boys on Bolivar [Street]" and later identified Michael Cochran from a photo line up.
¶ 3. Joseph Jones, a truck driver, parked his truck in a parking lot to get some rest. Around 5:00 a.m., Jones's rest was interrupted by two men standing near Jones's truck. One man asked if Jones could light his cigarette. The other man reached through the partially opened driver's side window and stuck a gun in Jones's stomach. The gunman demanded Jones's money. Jones responded that he did not have any money with him. Doubtful, the gunman searched Jones's pockets and found that Jones was truthful. Disappointed, the gunman shot Jones and ran away.
¶ 4. Later that same day, Jones attempted to identify his attackers from a photo line up. Jones could not identify a suspect. However, investigators were able to lift latent fingerprints from Jones's truck. Those fingerprints, taken from the driver's door, window, and handle, belonged to Michael.
¶ 5. Michael was arrested and Officer Linley obtained a warrant to search Michael's house. The search produced a 9mm pistol. The pistol belonged to Michael's father, Robert Cochran, Sr. Authorities sent the pistol to the State Crime Lab. The State Crime Lab performed ballistics tests on the pistol. The Crime Lab compared a spent casing, taken from Jones's truck, and a bullet that fell from Jones's stomach and leg to those from the pistol. According to the results of the tests, Robert's pistol was the same pistol that fired the bullet that wounded Jones.
¶ 6. At trial, the State produced the testimony of Collins and Jones. Both men identified Michael as their assailant. The State also presented the fingerprint evidence and the results of the Crime Lab ballistics tests. Michael presented the testimony of Carlos Fox. Fox testified that he *374 witnessed Collins's robbery at Kemp's. Fox also testified that the gunman was not Michael, but was Terrell Archer. Fox testified that he had known Archer for several years. Fox also testified that, prior to the Collins robbery, Fox saw Archer with Robert's pistol.
¶ 7. Michael also presented the testimony of Anthony Atkins. Atkins, a friend of Archer's, testified that Archer had Robert's pistol on June 20, 2002, five days after both robberies. Atkins testified that he took the pistol from Archer's house and took it back to Robert.
¶ 8. Michael attempted to introduce evidence that Archer, an unavailable witness, made a statement against his interest when Archer admitted to robbing a truck driver. The trial court did not permit this statement into evidence.
¶ 9. Michael also called his father, Robert Cochran, Sr., who testified that from the night of June 16, 2002 until June 17, 2002, his son, Michael Cochran, slept in the same bedroom with his parents and was still in bed at 6:30 a.m. on the morning of June 17. Robert also testified that the pistol did belong to him and that he did not know it was missing until Atkins returned the pistol to him some time between June 19 and 20.

Analysis

I. DID THE COURT ERR IN FAILING TO GRANT THE DEFENDANT'S ALIBI INSTRUCTION.
¶ 10. Michael attempted to instruct the jury according to the following instruction:
"Alibi" means elsewhere or in another place. In this case, the Defendant is asserting the defense of alibi by saying that he was at home with his family. "Alibi" is a legal and proper defense in law. The Defendant is not required to establish the truth of the alibi to your satisfaction, but if the evidence or lack of evidence in this case raises in the minds of the jury a reasonable doubt as to whether the Defendant was present and committed the crime, then you must give the Defendant the benefit of any reasonable doubt, and find the Defendant not guilty.
¶ 11. The State inquired whether any evidence was on the record that supported that instruction. Michael's counsel responded that Robert testified that Michael was at home at the time of the robberies. The trial court felt that Robert's testimony was inconsistent and pointed out that on cross-examination, Robert indicated that Michael did not spend the night at home. The trial court also pointed out that there was no other alibi evidence and that the defense did not rehabilitate Robert's alibi testimony on redirect. Michael's counsel agreed that Robert's testimony was inconsistent. The trial court concluded that the jury should not be instructed according to the portions of Michael's requested instruction because during cross-examination and redirect, Robert testified that Michael spent the night with a friend.
¶ 12. Michael argues that the trial court erred by refusing his requested jury instruction. Michael admits Robert's inconsistent testimony but maintains that it was unclear from the questioning whether Robert meant that Michael spent the night of Sunday, June 16th with a friend or whether he meant that Michael spent the night of Monday, June 17th with a friend. Michael claims that it was clear that Robert testified that Michael was at home in his bed on the night of the 16th.
¶ 13. At trial, the following exchange took place:
Q. Let me direct your attention back to that Sunday night, Monday morning, on June 17  June 16, June 17 *375 of 2002. Was Michael Cochran at home?
A Yes, he was.
However, on cross examination, Robert seemed unsure whether Michael was at home that night.
Q. Tell us this. How do you explain the fact that his fingerprints were found on the truck that was parked down there at something like 5:00 o'clock that morning?
A. Well, I can't really explain. But that  that night, he had spent the night over at a friend's house, and his name is Jerry. And it's in the 900 block of Lincoln.
Q. All right. Well, did he spend the night with you or spend the night with Jerry?
A He spent the night with Jerry.
On redirect, Robert testified that he was not sure about where Michael spent the night of June 16, 2002.
Q. Mr. Cochran, Mr. Mellen asked you about Michael Cochran spending the night. What night are you talking about that he spent the night with Jerry?
A. Well, I can't really recall. But he does go over and spend the night with his friends.
Q. Now, on June 16, that Sunday night/Monday morning, where did he spend the night?
A. When was that now?
Q. June 16/17, Sunday night/Monday morning, where did Michael sleep?
A. It was  it's a possible chance he had spent the night over at Jerry's  over at Jerry's house.
¶ 14. This Court reviews jury instructions as a whole, rather than individually. Wilson v. State, 592 So.2d 993 (Miss.1991). When a defendant asserts the defense of alibi, and presents testimony in support of that defense, the defendant is entitled to a jury instruction focusing upon such a theory. Young v. State, 451 So.2d 208, 210 (Miss.1984); Thompson v. State, 807 So.2d 471(¶ 9) (Miss.Ct.App.2001). However, jury instructions must be supported by the evidence. Id. Where the proof does not support an alibi defense, the instruction should not be granted. Moore v. State, 822 So.2d 1100(¶ 37) (Miss.Ct.App.2002).
¶ 15. During cross-examination, Michael's father testified that his son Michael Cochran spent the night at a friend's house on the date in question. Additionally, Robert did not disavow this on redirect examination. Accordingly, Robert's testimony indicated that he did not know where Michael spent the night of June 16, 2002. Because no other witness placed Michael at home at the time of the crime, the trial court was correct to deny Michael's alibi instruction because the alibi instruction had no foundation in the evidence.

II. DID THE COURT ERR IN OVERRULING DEFENDANT'S MOTION TO SUPPRESS THE PHOTOGRAPHIC LINE-UP.
¶ 16. Prior to trial, Michael filed a motion to suppress Collins's identification testimony. Collins identified Michael as his assailant out of six photographs. Michael argued that the photo lineup was suggestive to a degree that mandated a finding that Collins's identification became tainted. The trial court determined that the photographic lineup was not impermissibly suggestive. Accordingly, the trial court denied Michael's motion to suppress Collins's identification testimony. Michael argues that the circuit court should have granted his motion to suppress the evidence that resulted from the photographic lineup.
*376 ¶ 17. "The admission or exclusion of evidence is largely within the discretion of the trial court." Thompson v. State, 726 So.2d 233(¶ 9) (Miss.Ct.App. 1998) (citations omitted). When determining whether to suppress evidence of a pre-trial identification, the trial court must resolve whether the identification procedure used by law enforcement was unnecessarily suggestive. Id. Even if a trial court finds that a pre-trial identification procedure was impermissibly suggestive, that finding does not preclude introduction of the identification evidence. Id.
¶ 18. If an accused is "conspicuously singled out in some manner from others" in a photographic lineup, that photographic lineup is impermissibly suggestive. York v. State, 413 So.2d 1372, 1383 (Miss.1982). "Regarding an improperly suggestive pre-trial identification tainting subsequent identification at trial, this Court evaluates the factors enumerated in Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) to determine whether the in-court identification is `sufficiently reliable to overcome the taint of the prior improperly attained identification.'" Ellis v. State, 667 So.2d 599, 605 (Miss. 1995) (citing Gayten v. State, 595 So.2d 409, 418 (Miss.1992)).
¶ 19. Collins described his assailant as a young black male wearing a baseball cap, a white t-shirt, and blue jeans. Additionally, Collins noticed that his assailant had hair that "stuck up on his head." Collins had a notion of his attacker's identity before he looked at the photographic lineup. Collins alleged that his assailant was "one of the Cochran boys" that lived on Bolivar Street. Collins was presented with six photographs. Of those six, Michael Cochran and Robert Cochran, Jr. were depicted, as well as four others. Collins identified Michael Cochran as his assailant.
¶ 20. Michael argues that Collins's identification, out-of-court and in-court, were tainted due to the suggestiveness of the photo line-up. Michael argues that he was the only suspect with no facial hair. Further, that he did not have any hair on top of his head  an identity trait that Collins used to describe his assailant. Michael notes that no one in the photo line-up had on a baseball cap  also pointed out by Collins during his recollection of the assailant. Additionally, Michael points out that, in the six pictures, he had a darker complexion than the other suspects. Michael also alleges that he was prejudiced because none of the pictures in the lineup showed a suspect wearing a cap or with a dark complexion, so he became singled out as the suspected robber. Michael concludes that, as such, the pre-trial identification was suggestive to the point of creating an unreasonable risk of mis-identification.
¶ 21. As mentioned, a photographic lineup is impermissibly suggestive if an accused is "conspicuously singled out in some manner from others." York, 413 So.2d at 1383. In Jones v. State, 504 So.2d 1196 (Miss.1987), the Mississippi Supreme Court addressed the issue of whether differences in a photograph array rose to the level of an impermissible suggestion. The defendant in Jones was the only suspect of the seven in the photograph array that wore a baseball cap. Id. at 1199. The supreme court determined that these minor differences did not give rise to an impermissible suggestion. Id.
¶ 22. In Brooks v. State, 748 So.2d 736(¶ 72) (Miss.1999), a defendant was depicted in a photographic array and was the only picture in the array of a person with long hair. There, the supreme court held that "although there might be a slight suggestion of impermissibility in the use of the photograph of the defendant in which *377 his hair is longer than the others depicted,... nothing in the photographic array nor the procedure used, gives rise to a substantial likelihood of misidentification." Id.
¶ 23. Michael's primary argument is that his picture did not depict him as corresponding to the description of the assailant as given by Collins. That is, Collins described his assailant as having long hair and wearing a baseball cap, but Michael, like the suspects in the other five pictures, was not wearing a baseball cap in his picture. Accordingly, nothing about the fact that Michael was not wearing a baseball cap suggests that Michael was Collins's assailant. Similarly, Michael argues that he did not have long hair that stuck up in his picture, though one suspect did have hair that stuck up. If anything, that Michael did not have long hair in his picture would not create an impermissible suggestion that Michael was Collins's assailant. If anything, exclusion from a description would seem to discourage identification, rather that suggest identification.
¶ 24. Regarding Michael's assertion that no other suspect had a dark complexion, the record contains a black and white photocopy of the lineup. As a result, it is impossible to determine the degree to which the suspects' complexions vary. At trial, Michael's counsel stated that "a couple" of the suspects had lighter complexions than Michael. That description suggests that the remaining suspects had equal or darker complexions than Michael. Accordingly, there is no impermissible suggestion that Michael was Collins's assailant.
¶ 25. Finally, Michael asserts that his picture was the only one in which the suspect lacked facial hair. Though there might be a minuscule suggestion of impermissibility, nothing about that fact gives rise to a substantial likelihood of misidentification. Jones v. State, 504 So.2d 1196 (Miss.1987). It bears mentioning that Collins told the investigating officer that "one of the Cochran boys" robbed him at gunpoint. Accordingly, Collins displayed an independent source of knowledge regarding Michael's identification. Further, Michael offers no proof as to why Collins would accuse him falsely. Consequently, the trial judge did not abuse his discretion in admitting Collins's in-court and out-of-court identifications of Michael.

III. DID THE COURT ERR IN FAILING TO ALLOW THE DEFENDANT TO INTRODUCE EVIDENCE OF AN ALLEGED CONFESSION BY AN UNAVAILABLE WITNESS TO ONE OF THE CRIMES FOR WHICH THE DEFENDANT WAS CHARGED.
¶ 26. At trial, Michael attempted to call Atkins as a witness. Atkins would have testified that he heard Terrell Archer admit that Archer robbed a truck driver in the same area in which Jones was robbed. The trial court permitted a proffer of Archer's testimony, but ultimately decided that Archer would not be allowed to testify. On appeal, Michael argues that the trial court should have allowed Atkins's hearsay testimony based on Rules 804(a)(5), 804(b)(3) and 804(b)(5) of the Mississippi Rules of Evidence.
¶ 27. "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M.R.E. 801(c) (internal quotations omitted). "Hearsay is not admissible except as provided by law." M.R.E. 802. Inadmissible status notwithstanding, hearsay is admissible under limited exceptions. See M.R.E. 803 and 804. Rule 804 dictates that a number of those exceptions *378 depends on whether the declarant is "unavailable."
¶ 28. Michael asserts that Archer's statements are statements against interest, as contemplated by Rule 804(b)(3). That is, Michael would have this Court view Archer's statement that he robbed a truck driver as a statement "which was at the time of its making ... so far tended to subject him to ... criminal liability, ... that a reasonable man in [Archer's] position would not have made the statement unless he believed it to be true." M.R.E. 804(b)(3). An additional condition, "[a] statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." Id. Michael claims that two reliable unbiased witnesses corroborate Archer's claim  Atkins heard Archer's statement and Fox testified that he saw Archer rob Collins. Michael also claims that he could not procure such evidence by any other reasonable means.
¶ 29. Truly, where a witness is unavailable, a statement against interest, though hearsay, may be admissible. M.R.E. 804(b)(3). However, the State takes issue with Michael's assertion that Archer was an unavailable witness. The State responds that Archer was not "unavailable" within the meaning of Rule 804. That being stated, our resolution of this issue depends on whether Archer was an "unavailable" witness as contemplated by Rule 804.
¶ 30. "A declarant is `unavailable' where the declarant ... [i]s absent from the hearing and the proponent of his statement has been unable to procure his attendance... by process or other reasonable means ..." M.R.E. 804(a)(5). Archer was not under subpoena to appear at trial and Michael made no efforts to procure Archer's attendance. Michael explains that even if Archer had been before the trial court, "the likelihood of his admitting to his confession of the crime would be slim to none." However, a presumption or suspicion that someone will assert his Fifth Amendment privilege against self-incrimination and refuse to testify is insufficient to declare a witness unavailable for 804(b)(3) purposes. Slater v. State, 731 So.2d 1115(¶ 9) (Miss.1999). "They must be called to the stand and there refuse to testify before they become unavailable due to invoking the Fifth Amendment." Id. Consequently, Archer was not "unavailable" to testify. Accordingly, Archer's statement is not admissible under the "statement against interest" exception to the hearsay rule. The trial court did not abuse its discretion in suppressing Archer's statement.
¶ 31. In an additional argument, Michael claims that Atkins hearsay testimony is admissible pursuant to the "other exceptions" portion of Rule 804. Rule 804(b)(5) describes other exceptions to the hearsay rule. Rule 804(b)(5) says that "[a] statement not specifically covered by any [other] exception but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and interests of justice will best be served by admission of the statement into evidence."
¶ 32. Michael did not assert M.R.E. 804(b)(5) at trial and is barred from asserting it on appeal. Byrom v. State, 863 So.2d 836, 865-66 (Miss.2003). Even if Michael had asserted Rule 804(b)(5) at trial, this Court would not apply that exception. *379 Rule 804(b)(5) also requires that the declarant be unavailable. As discussed above, the declarant, Archer, was not unavailable to testify. This issue is without merit.
¶ 33. THE JUDGMENT OF THE CIRCUIT COURT OF COAHOMA COUNTY OF CONVICTION OF COUNT I, ARMED ROBBERY, AND SENTENCE OF FIFTY YEARS, COUNT II, ATTEMPTED ARMED ROBBERY, AND SENTENCE OF FIFTY YEARS, AND COUNT III, AGGRAVATED ASSAULT, AND SENTENCE OF TWENTY YEARS, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH COUNT III TO RUN CONCURRENT TO COUNTS I AND II IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO COAHOMA COUNTY.
KING, C.J., LEE, P.J., MYERS, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR. IRVING, J., CONCURS IN RESULT ONLY.