# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-KA-00615-COA

WILLIAM MICHAEL JORDAN A/K/A BOOTY      APPELLANT

v.

STATE OF MISSISSIPPI      APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 04/14/2014 |
| TRIAL JUDGE: | HON. ROBERT WALTER BAILEY |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | CHARLES W. WRIGHT JR. |
| | REBECCA TAFF WRIGHT |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LADONNA C. HOLLAND |
| DISTRICT ATTORNEY: | BILBO MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF COUNT I, MURDER, AND COUNT IV, FELON IN POSSESSION OF A FIREARM, AND SENTENCED IN COUNT I TO THIRTY-FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH FIVE YEARS SUSPENDED AND THIRTY YEARS TO SERVE, FOLLOWED BY FIVE YEARS' SUPERVISED POSTRELEASE SUPERVISION AND THEN FIVE YEARS' UNSUPERVISED POSTRELEASE SUPERVISION, AND IN COUNT IV TO TEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, TO BE SERVED CONCURRENTLY WITH THE SENTENCE IN COUNT I |
| DISPOSITION: | AFFIRMED - 12/08/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**MAXWELL, J., FOR THE COURT:**

¶1.    Evidence that a criminal defendant attempted to intimidate a witness into not testifying against him is an incriminating circumstance, tending to show a guilty conscience.[1] For this reason, we find no error in the trial court admitting evidence that William Jordan and his codefendant, Charles Henderson, threatened the two eyewitnesses to Jordan's murder of Aaron Coleman by participating in a rap video about killing snitches—a video published on YouTube after the two witnesses had implicated Jordan and Henderson but before Jordan's trial commenced.

¶2.    Nor do we find any error in the trial court's refusal, at the end of trial, to give a cautionary instruction about accomplice testimony. The two eyewitnesses had been charged as accessories after the fact, not accomplices. So no accomplice instruction was required. The jury was instead permitted to weigh their credibility against Jordan's and other defense witnesses' as they saw fit. The jury did just that and, after deliberating, found Jordan guilty of depraved-heart murder and felon in possession of a firearm.

¶3.    Because this verdict was supported by sufficient evidence and was not against the overwhelming weight of the evidence, we affirm Jordan's conviction and sentence.

<strong>Background Facts and Procedural History</strong>

### I.    Investigation

¶4.    Late in February 2012, Coleman's mother reported him missing. Coleman's car was

---

[1] *Mattox v. State*, 243 Miss. 402, 413, 137 So. 2d 920, 923 (1962).

2

soon found outside of Meridian. But several more days passed before Coleman's body was discovered in the woods near Interstate 20.

¶5. Coleman was last seen alive on February 27 at Jordan's house. When questioned, Jordan confirmed Coleman had stopped by that day. But Jordan told the Meridian Police that Coleman had only stayed a few minutes. After that, Jordan supposedly never saw him again. Charlie Henderson and Bobby Baker—longtime friends of both Coleman and Jordan—had also been at Jordan's house that evening. And they gave similar stories to the police.

¶6. The police were told they should also question JaMichael Smith, because he had been at Jordan's house that night too. But Smith quickly left Meridian late that night on a Greyhound bus headed for Michigan. A year later, Smith was extradited from Michigan to Mississippi, where he finally told the police his version of what happened.

### A. Smith's Account

¶7. While Smith had grown up in Meridian, he moved to Michigan when he was seventeen. For five years he stayed away. But he returned to Meridian in February 2012 for his grandfather's funeral. He ended up at Jordan's house on February 27, drinking and smoking marijuana. According to Smith, everyone seemed to be having a good time when Jordan went to his bedroom and retrieved a shotgun. Jordan returned to the living room, where both Henderson and Coleman were. Jordan began waving the gun around. Smith got nervous, so he went into the kitchen. Smith heard the gun go off. He saw Coleman bent over in the corner of the living room. Smith ran out the back door of Jordan's house and took the first bus out of town.

### B. Baker's Account

¶8. Once Smith was in custody in Mississippi, Baker came forward too. He admitted he had initially lied to investigators when he denied knowing what happened to Coleman. The truth, according to Baker, was that he too was in Jordan's living room, drinking and smoking marijuana, when Jordan shot Coleman.

¶9. Coleman claimed he had received a phone call from his mother, saying it was time to come home. Henderson started teasing Coleman about having a curfew. This is when Jordan retrieved the shotgun. Like Smith, Baker was worried about the gun, so he kept his eyes on Jordan. He saw the gun go off, Henderson lunge, and Coleman—who was standing right behind Henderson—get shot in the stomach.

¶10. Coleman fell over, but he was still breathing. Baker wanted to call for an ambulance. But Jordan pointed the gun at him and told him to stop. Baker tried to reason with Jordan, saying everyone would see it was an accident and that Jordan did not know the gun was loaded. So with Coleman still alive, Baker started to call 911. But Henderson told him to hang up. Baker saw Smith run out the back door.

¶11. About ten minutes went by. Coleman was still alive, and Jordan and Henderson were trying to figure out what to do. They finally told Baker to help them load Coleman into the back of Jordan's Honda. Baker got into the backseat with Coleman. Jordan and Henderson stayed outside the car, further devising a plan. Another five minutes passed. And Coleman suddenly stopped breathing and his whole body stopped moving. Henderson opened the door and saw that Coleman had died.

¶12.    At this point, Jordan's live-in girlfriend pulled up in her car. Henderson quickly shut the car door to conceal Coleman's body. Jordan followed his girlfriend into his house for a few minutes, while Henderson rifled through Coleman's pockets and found his keys. Baker testified that Henderson then pulled out a pair of gloves. When Jordan exited his house again, Jordan got into the driver's seat of his car. Henderson, gloves on, then took Coleman's keys and got into Coleman's car. The two cars started driving around Meridian. The whole time Jordan and Henderson were on their cell phones trying to figure out what to do. Jordan eventually turned onto I-20 but ran out of gas. He veered over to the shoulder and waited for Henderson to bring him more fuel.

¶13.    When Henderson pulled up behind them with a gas can fifteen minutes later, he was surprised Coleman's body was still in the backseat. Baker and Jordan then lifted the body out of the car and rolled it down an embankment, where it was found days later. The two cars then drove off down the interstate. They took a nearby exit, where they dumped Coleman's car.

¶14.    The three then drove to Henderson's house in Jordan's car. There, a fourth man came out with a metal barrel and started a fire. Baker testified he, Jordan, and Henderson threw their clothes into the fire, along with Coleman's cell phone and wallet.

C.    Indictment

¶15.    Jordan was indicted for second-degree murder. *See* Miss. Code Ann. § 97-3-19(1)(b) (Rev. 2014). He was also charged with felon in possession of a firearm. *See* Miss. Code Ann. § 97-37-5 (Rev. 2014).

¶16.    Henderson and Baker were indicted as accessories after the fact to the murder, for their role in dumping Coleman's body.  Smith too was indicted as an accessory after the fact, because he knew Jordan had killed Coleman but did not come forward until almost a year later.  *See* Miss. Code Ann. § 97-1-5 (Rev. 2014) (punishing "[e]very person . . . convicted of having concealed, received, or relieved any felon, or having aided or assisted any felon, knowing that the person had committed a felony, with intent to enable the felon to escape or to avoid arrest, trial, conviction or punishment after the commission of the felony").

## II.    Trial

¶17.    Jordan and Henderson were set to be tried together.[2]  But the morning of trial, after the jury was selected, Henderson moved for severance.  Apparently, Jordan had subpoenaed Henderson as a defense witness, and to avoid issues with Henderson asserting his Fifth Amendment right against self-incrimination in response to certain questions by Jordan in the joint trial, the judge granted Henderson's motion.  And Jordan was tried separately.

¶18.    During Jordan's trial, Smith and Baker testified for the State, but Jordan ultimately decided not to call Henderson to testify.  Jordan, however, took the stand and testified in his own defense.  Jordan stuck to his original story—that while he, Coleman, Henderson, and Baker had all been at his house on February 27, Coleman left after a few minutes.  Jordan's girlfriend also testified.  She said he had come home at 3 p.m. that day.  While Henderson and Baker were there with Jordan, she insisted Coleman had never come by that day.  Nor did Jordan ever leave with Henderson and Baker.

---

[2] Smith and Baker had indicated they wanted to plead guilty, so they were not set to be tried with Jordan and Henderson.

¶19. No physical evidence was offered. The Meridian police officer who was investigating the disappearance of Coleman had gone to Jordan's home to question him. But not yet realizing Jordan's house was the crime scene, the officer did not search the house. By the time Smith and Baker had given their statements to the police, Jordan and his girlfriend had moved out of the house, which had been cleaned after they vacated it. Jordan had also gotten rid of his Honda. The medical examiner testified that, due to the close range of the shotgun, all the shot from the blast hit Coleman. None of the pellets would have scattered around the room. And neither the shotgun shell casing nor the gun was ever recovered. While a forensic team dusted Coleman's car for prints, the only ones they found belonged to Coleman.

¶20. At the close of trial, Jordan's counsel requested an alibi instruction and a cautionary instruction about accomplice testimony. Both were refused.

¶21. The jury found Jordan guilty of murder and felon in possession of a firearm. After the court denied his motion for a judgment notwithstanding the verdict or, alternatively, a new trial, Jordan appealed.

**Discussion**

### I.     *YouTube Video*

¶22. Jordan's first issue on appeal surrounds the admission of rap video, published on YouTube.

¶23. Jordan appears in the video. But the main performer in the video is Henderson—who was also implicated by Smith and Baker and was charged as an accessory after the fact to

7

Coleman's murder. Shortly after the video begins, there is a close-up shot of Jordan's face. The scene then turns to his codefendant, Henderson, who begins rapping, "used to be my homeboy—used to be. Asked him why he flipped on me." The rap proceeds to question how a life-long friend could turn State's evidence. Henderson repeatedly warned that when "it's your turn, you gonna burn." While Jordan does not rap in the video, at one point he can be seen singing along with the chorus, waving his middle finger and making other hand motions that go along with the words.

¶24. The rap song is followed by a scene featuring Henderson but not Jordan. In this segment, an unidentified man walks up to Henderson and his circle of friends. The group chases the man into the woods. Henderson then tells the man, "You already know," and repeatedly asks him, "How you kill a snake?" Henderson then pulls a handgun on the man. The video ends with Henderson pointing the gun directly at the camera. The screen goes blank and a gunshot rings out.

¶25. The trial judge admitted the video, over Jordan's objection. While he now raises multiple claims against admission on appeal, at trial Jordan asserted only two reasons why the video should not be admitted: (1) the video had not been properly authenticated, and (2) the video was not relevant. Because "[i]t is well-settled law that one cannot offer and argue on appeal a different basis than what was offered at trial in objecting to admission of evidence," we limit our review to the two bases Jordan offered prior to the video's admission. *Platt v. State*, 151 So. 3d 236, 241 (¶16) (Miss. Ct. App. 2014).

¶26. We review the trial court's decision to admit the video for abuse of discretion. *Id.* at

8

240 (¶14). And after delving into Jordan's claims that the video had not been properly authenticated and had no relevance, we find no abuse.

### *A. Relevance*

¶27. We begin with the video's relevance. "Generally speaking, all evidence introduced in a criminal prosecution must be relevant to the guilt or innocence of the accused[.]" *Mattox v. State*, 243 Miss. 402, 413, 137 So. 2d 920, 923 (1962); *see also* M.R.E. 402 ("Evidence which is not relevant is not admissible."). "[B]ut that rule is not violated by the admission of evidence that [the] accused attempted to suppress evidence against himself." *Mattox*, 243 Miss. at 413, 137 So. 2d at 923. This is because evidence of a defendant's attempt to keep a witness from testifying has "probative value as an incriminating circumstance inconsistent with [the defendant's] innocence[,] and as tending to show a consciousness of guilt and that his cause lacked honesty and truth." *Id.* Thus, this type of evidence is admissible as part of the State's case-in-chief. *Id.*

¶28. The State introduced the rap video about retribution against snitches as evidence that Jordan tried to keep Smith and Baker from testifying. The video was posted on YouTube after Smith and Baker had given statements incriminating Jordan and Henderson. Smith gave his statement identifying Jordan as the gunman on April 3, 2012, and Baker implicated Jordan and Henderson on June 15, 2012. The video was posted on YouTube on April 9, 2013, while Jordan and Henderson were awaiting trial. Jordan's case was severed and began on February 3, 2014. So obviously, at the time the video was posted Smith and Baker had already cooperated with law enforcement but had not yet testified.

9

¶29. Later, during trial, Smith and Baker both confirmed they felt threatened by the video. Smith said after watching the video, "I really wanted to give up. I didn't want to deal with none of this no more. I just wanted to be—it came to a point in time where I actually—I wanted to kill over myself . . . ." During Baker's testimony, the State pressed him about why he withheld the truth about what happened to Coleman for so long, considering how close a friend he had been to Coleman. Baker admitted part of the reason was that he feared retribution from Jordan and Henderson. While Baker could have left town, his mother would still be in Meridian. When he learned about the YouTube video, Baker said he felt threatened and called his attorney, who notified the police. Because Jordan's willing participation in the video was probative of witness intimidation, or as our supreme court has put it, "evidence showing a conscience of guilt and that his cause lacked honesty[,]" the video was relevant evidence, which the jury was permitted to consider. *See id.*

¶30. On appeal, Jordan argues any probative value the video may have had was outweighed by the danger of unfair prejudice. *See* M.R.E. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]"). Jordan asserts the judge erred by admitting the video without first conducting an on-the-record Rule 403 balancing test, which he claims was necessary because the video was admitted over and against Mississippi Rule of Evidence 404(b). But prior to the video's admission, Jordan never asserted the video's introduction would violate Rule 404(b), which makes evidence of other wrongs inadmissible to show the defendant's bad character. *See* M.R.E. 404(b). A Rule 404(b) objection, even if overruled, would have triggered a Rule 403

10

balancing test. *Johnson v. State*, 44 So. 3d 1040, 1045 (¶19) (Miss. Ct. App. 2010) (citation omitted). But here, there was no objection on this basis. So we find no error in the trial court's "failure" to ensure the danger of unfair prejudice substantially outweighed the probative value of the video before allowing the video's admittance.[3]

¶31. In *United States v. Begay*, the Ninth Circuit was faced with the same argument on appeal—"that evidence showing that [the defendant] sought to intimidate the witnesses against him was inadmissible under Federal Rules of Evidence 403 and 404(b)." *Begay*, 673 F.3d 1038, 1046 (9th Cir. 2011). Like Jordan, the defendant in *Begay* had not asserted at trial that such evidence violated Rules 404(b) and 403. *Id.* Applying the plain-error doctrine, the Ninth Circuit found no error. "First, the evidence in question was admissible to show [the defendant's] consciousness of guilt." *Id.* (citing *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 897 (9th Cir.1996)). "Second, its probative value outweighed any danger of unfair prejudice because the evidence also tended to explain why [the witnesses] delayed coming forward to investigators[.]" *Id.*

---

[3] As the dissent points out, *after* the State had rested and just prior to his taking the stand, Jordan did renew his motion for a mistrial. And in this oral motion, his counsel did for the first time cite *Brooks v. State*, 903 So. 2d 691, 699-700 (¶¶29-35) (Miss. 2005), for the proposition that, in that case, the Mississippi Supreme Court "held that it was reversible error to admit evidence of . . . rap lyrics discussing murder[.]" The circuit judge responded that the video was relevant and probative because Jordan participated in the video. And the State had shown the "consensus message that's described in the video"—killing a life-long friend for turning State's evidence—was connected to the State's two key eyewitnesses, Smith and Baker.

"Whether to grant a motion for a mistrial is within the sound discretion of the trial court." *Caston v. State*, 823 So. 2d 473, 492 (¶54) (Miss. 2002). And for the reasons stated in paragraphs 31 and 32 of this opinion, we find the trial court did not abuse its discretion here by denying Jordan's renewed motion.

¶32. Likewise we find no plain error. Contrary to Jordan's insistence, the State did not merely introduce the video as bad-character evidence. Rather, the video was evidence that Jordan tried to prevent Smith and Baker from testifying. Indeed, the second verse of the rap contains the lyrics, "Ain't goin' to say nobody's name. You know all of em's to blame. . . . You a jerk. Your kind the kind to get 'murk'[4] for saying foolish shit." And in verse three, "*Ain't goin' say you took the stand, you cracked before you made it . . . . He's been a bitch since he was five. Y'all won't make it in these woods, y'all goin' to eat your words alive.*" (Emphasis added). So the video's threatening nature was "probative evidence" of Jordan's guilt. *Mattox*, 243 Miss. at 413, 137 So. 2d at 923; *see also State v. Wilson*, 171 So. 3d 356, 365 (La. Ct. App. 2015) (finding "[e]vidence of attempts by a defendant to intimidate witnesses for the State has *substantial probative value*" (emphasis added)). After review, we do not find its probative value was so outweighed by potential unfair prejudice as to warrant reversal. "The offensiveness of threatening personal harm to a witness . . . implies a knowledge and fear of particular and damaging testimony intimately related to the prosecution at hand[.]" *United States v. Monahan*, 633 F.2d 984, 984 (1st Cir. 1980) (per curiam). "Because [such] evidence implicated no irrelevant or collateral matters"—but instead was relevant to show consciousness of guilt[5]—"any 'prejudice' that arose did so only

---

[4] "Murk" is slang for murder. *United States v. Scruggs*, 226 F. App'x 258, 261 (4th Cir. 2008) (unpublished).

[5] *See also United States v. Miller*, 276 F.3d 370, 373 (7th Cir. 2002) ("Evidence that the defendant threatened a potential witness or a person cooperating with a government investigation is relevant to show the defendant's consciousness of guilt."); *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 897 (9th Cir.1996) (holding that evidence of witness intimidation is clearly admissible to show consciousness of guilt); *United States v. Mendez-Ortiz*, 810

12

because of the evidence's probative character." *Id.* And "Rule 403 is not contravened by evidence that might show only that the defendant is guilty of the crime charged." *Id.*

¶33. We comment briefly on the dissent's lengthy description of its personal feelings about the video's probative nature. What is clear is that the dissent views the video, not for the reason it was admitted—evidence of witness intimidation—but through its own interpretation. From hypothesizing about the video's "splices" and "dub overs" to citing articles about "the spectacularly common themes in rap music," the dissent injects quite a bit of speculation.

¶34. But lost in this fray is the reality that the murder charge against Jordan was not a fiction or generalization of the rap industry—it was fact. And the video was not an innocuous offering performed by some far-away artist or unknown person. It was local and starred Jordan's charged codefendant, Henderson, as the main rapper in the video. And Jordan—who at the time was under indictment with Henderson and awaiting trial for murder—willingly participated and appeared in it. Another undeniable truth is that even Jordan concedes the video was about killing snitches. And the evidence at trial showed the video was only published to YouTube *after* Jordan and his codefendant and co-rapper, Henderson, got wind that Baker and Smith had implicated them in the murder and coverup.

¶35. Though the dissent might believe it is practically cliche in the rap world for codefendants awaiting their murder and coverup trial to voluntarily participate in a video about killing cooperating witnesses before they can take the stand, the real-life cooperators

F.2d 76, 79 (6th Cir.1986) (holding that evidence of the defendant's attempts to intimidate an adverse witness is admissible to establish "consciousness of guilt").

13

here, Baker and Smith, did not. And they, not the dissent, have actually known Jordan and Henderson since childhood. So we find them in the better position to appreciate what these taped warnings meant. Indeed, even the dissent must concede that the video's so-called "narrator" boasts that the unnamed snitch will know whom the threat is directed towards. And both Baker and Smith believed the threat was real and pointed at them.

¶36. We thus find the video probative for the same reason the trial judge (and obviously Baker and Smith) did, because it was aimed at intimidating these witnesses into not testifying.

### B. Authentication

¶37. Still, before relevant evidence is admitted, it must be authenticated. M.R.E. 901(a). "One means to authenticate evidence is through the testimony of a witness with knowledge 'that a matter is what it is claimed to be.'" *Riley v. State*, 126 So. 3d 1007, 1009 (¶7) (Miss. Ct. App. 2013) (quoting M.R.E. 901(b)(1)).

### 1. Knight's Knowledge

¶38. The State claimed the video was a rap video published on YouTube before Jordan's trial, featuring Henderson and Jordan. Before admitting the video, the State questioned Danny Knight, an investigator with the Mississippi Bureau of Investigations. Knight joined the Meridian Police Department's investigation of Coleman's death once the case went cold. Knight was the investigator who obtained the statement from Smith about what happened the night of Coleman's death. And Baker finally came clean to Knight and admitted he had been covering for Jordan for months. The State asked Knight if Smith and Baker had given him

14

any reason why they had been hesitant to contact the police. Knight responded that Baker's counsel had alerted him to a threatening video on YouTube. Knight himself went to YouTube and found the video. From his involvement in the investigation, he recognized Jordan and Henderson in the video. Because of what the video depicted, he agreed with Baker's counsel—the video was meant as a threat. Knight testified he participated in the process of downloading a copy of the video onto a compact disc. And he verified the State had brought the same disc to court that day. Based on his testimony, we find Knight had sufficient knowledge to authenticate that the video was what the State claimed it to be—a video published on YouTube featuring Jordan and Henderson. *See* M.R.E. 901(b)(1).

¶39. Jordan suggests that Knight's knowledge was insufficient because he did not know when the video was made, who produced it, or when it was published on the internet. But we are of the same mind as the California Court of Appeals, which found similar challenges to a YouTube video went to the issues of the reliability and weight of the video, not its authentication. *People v. Torres*, 2012 WL 1205808, at \*4 (Cal. Ct. App. Apr. 11, 2012) (unpublished). *Jordan himself confirmed he had been a willing participant in the video.* And the scenes he was in were shot in Henderson's home. But Jordan also testified he did not write or rap the song in the video and was not part of the final scene in which Henderson chases a man into the woods and shoots him. We find it was up to the jury to decide what weight, if any, to give the video, in light of Jordan's testimony.

### 2. Knight's Comments

¶40. That said, we are concerned that Knight, in trying to lay the proper foundation for the

15

video, may have overstepped his bounds. When first asked about the video, Knight said it contained a "reenactment . . . of the killing of Aaron Coleman." Even the State concedes this was a mistake. Knight later testified, "in [his] opinion," that the final scene depicts getting a witness, "which is Mr. Baker," into the woods and killing him for turning. While this description is more objectively accurate, it was still "based on nothing beyond [Knight's] own inspection of the contents of the video"—and not his firsthand knowledge. *Pulliam v. State*, 873 So. 2d 124, 127 (¶18) (Miss. Ct. App. 2004) (finding an eyewitness's narration of a video not only permissible but helpful to the jury). Still, when weighed against the overall evidence, we find Knight's narration to be harmless. *See McClendon v. State*, 124 So. 3d 709, 714 (¶11) (Miss. Ct. App. 2013) (citing *Veasley v. State*, 735 So. 2d 432, 437 (¶17) (Miss. 1999)) (finding harmless error because "the weight of the overall evidence against [the defendant] heavily outweigh[ed] the harm done by allowing the officer's [hearsay] testimony"). The lyrics and visuals of the video are so pointed that no reasonable juror could interpret the video to be about anything other than retribution against a lifelong friend that turned State's evidence. Even Jordan, when questioned on cross-examination, conceded as much. He just denied that friend was Baker, instead claiming Henderson wrote the song about someone else. Further, the video was posted on YouTube after Smith and Baker had implicated Jordan and Henderson but before they had taken the stand and testified against Jordan at his trial. And both Smith and Baker testified they understood the video to be a direct threat to them—Smith to the point he contemplated suicide and Baker to the point he had his lawyer alert the authorities. Thus, we find Knight's comments, though improper, do

16

not warrant reversal.

¶41. But we are not as concerned with Knight's comments about Smith, Baker, and Jordan's statements, as Knight was relaying the events leading to all three men's arrests. On appeal, Jordan cites *Rose v. State*, 556 So. 2d 728 (Miss. 1990), to argue "Knight's testimony essentially instructed the jury that Baker and Smith's testimony was true and Defendant Jordan was guilty of murder." But Knight's testimony was not akin to the investigator's improper lay-opinion testimony in *Rose*. There, the investigator testified he had conducted "hundreds" of interviews of codefendants to the same crime and it was not unusual for there to be inconsistencies among their statements. *Id.* at 731. In fact, the investigator opined, it would have been unusual if there were no discrepancies in the statements. *Id.* at 731-32. On appeal, the supreme court found "[t]he lay opinion testimony of [the officer] was inadmissible," because "[h]e, in essence, told the jury that they were to believe the stories of the three codefendants, despite discrepancies among their accounts of the theft[.]" *Id.* at 733.

¶42. Here, Knight was not improperly giving lay opinion about the truthfulness of Smith, Baker, or Jordan. Instead, he was testifying about matters within his personal observation—namely, why the investigation of Coleman's death heated up and pivoted toward Jordan, after almost a year had gone by. After explaining the difficulty in getting a statement from Smith, Knight testified Smith had provided a credible lead, because what he told investigators fit with other aspects of their investigation. Knight pointed out how Smith's version actually matched Jordan's in that both placed Jordan, Smith, Henderson, Baker, and Coleman at Jordan's house that day. And after Smith began talking, Baker came

17

forward and also implicated Jordan, and his more-recent version coincided with much of Smith's description of events. From this, in contrast to *Rose*, we find no attempt to explain away discrepancies in Smith and Baker's statements. Nor did Knight suggest the jury should essentially overlook them. Rather, Knight, in explaining how the investigation unfolded, simply pointed out the same evidentiary conflict facing the jury—that Jordan, Smith, and Baker all said they were at Jordan's house and so was Coleman. But according to Jordan, Coleman left alive. And according to Smith and Baker, Coleman did not.

¶43. As the supreme court said in *Rose*, "A defendant must be allowed to point out discrepancies in witnesses' accounts of events, and to have the jury determine whether those witnesses are truthful." *Id.* And here, we find no prejudice to that right arising from Knight's testimony.

## II. Jury Instructions

### A. Alibi

¶44. Next, Jordan argues the trial court should have instructed the jury on his alibi defense theory. It is certainly true that, "[w]hen a defendant asserts the defense of alibi, and presents testimony in support of that defense, the defendant is entitled to a jury instruction focusing upon such a theory." *Cochran v. State*, 913 So. 2d 371, 375 (¶14) (Miss. Ct. App. 2005). But here, we agree with the trial court that Jordan's defense theory was not alibi.

¶45. Black's Law Dictionary defines "alibi" as "[a] defense based on the physical impossibility of a defendant's guilt by placing the defendant in a location *other than the scene of the crime at the relevant time*." Black's Law Dictionary 79 (8th ed. 2004) (emphasis

18

added). And even Jordan's proposed instruction defined "alibi" as "elsewhere or in another place." But Jordan's proposed instruction says Jordan's alibi was that "he was home with his [girlfriend] and did not shoot and dispose of the body of Aaron Coleman." According to the State's case, the scene of the shooting was Jordan's home. So Jordan's defense did not place him in a location other than the scene of the crime.

¶46. As we said in *Owens v. State*, when, based on the defendant's claimed location, "it would remain within the realm of physical possibility for the defendant to have committed the crime, then the defense is nothing more than a denial and would not rise to the level of alibi." *Owens*, 809 So. 2d 744, 747 (¶7) (Miss. Ct. App. 2002). And here, Jordan said he was at his house on February 27. So it would have certainly been physically possible to shoot Coleman in his living room. Thus, his claim that Coleman was not shot in his living room—but instead left Jordan's home alive earlier that day—is a *denial*, not an alibi. For this reason, we find the trial court did not abuse its discretion by refusing to give Jordan's alibi instruction.

### B.    *Accomplice Testimony*

¶47. Nor do we find the trial court abuse its discretion when it denied Jordan's proposed cautionary instruction about accomplice testimony. "The decision to give an accomplice instruction is within the trial court's discretion." *Hye v. State*, 162 So. 3d 818, 823 (¶16) (Miss. Ct. App. 2013) (citing *Burke v. State*, 576 So. 2d 1239, 1242 (Miss. 1991)). We find no abuse here, because Smith and Baker were never charged with being accomplices. Instead, they were both charged as accessories after the fact. *See id.* (finding the trial court

19

was within its discretion to deny an instruction on accomplice testimony because the witness, to whom the instruction was directed, was convicted as an accessory after the fact, not an accomplice).

¶48.    This court was confronted with the same scenario in *Bailey v. State*, 960 So. 2d 583, 591 (¶¶35-37) (Miss. Ct. App. 2007).  In *Bailey*, the defendant proposed a cautionary instruction about accomplice testimony.  *Id.* at (¶35).  But when the State pointed out the witness in question had been convicted as an accessory after the fact and did not meet the definition of an accomplice, the trial court denied the instruction.  *Id.* at (¶36).

¶49.    This court affirmed on appeal.  An accomplice is "a person who is implicated in the commission of the crime." *Id.* at 590 (¶30) (quoting *Slaughter v. State*, 815 So. 2d 1122, 1134 (¶66) (Miss. 2002)).  "On the other hand, an accessory-after-the-fact has been defined as 'a person assisting one who has completed the commission of a felony to avoid being apprehended, arrested, convicted, etc.'" *Id.* (quoting *Chase v. State*, 645 So. 2d 829, 851 (Miss. 1994)).  The witness in *Bailey* "was the lookout during the burial of the victim, she helped Bailey clean his bloody body, she saw [the victim] lying dead by her truck[,] and she kept quiet about the murder for more than a year until she was confronted by police." *Id.* at (¶37).  Thus, she was an accessory after the fact, not an accomplice, meaning "[n]o accomplice instruction was needed." *Id.*

¶50.    Here, Baker was never implicated in the murder.  Baker was not part of the group harassing Coleman right before he got shot.  And Baker, like Smith, was surprised and concerned to see Jordan retrieve a shotgun from his bedroom and wave it around the crowded

20

living room. When Coleman was shot, it was Baker who tried to call 911, only to be stopped by Jordan pointing the gun at him. But like the witness in *Bailey*, Baker did assist Jordan in dumping Coleman's body. And both Baker and Smith concealed Jordan's involvement from the police for almost a year. This is what made them accessories after the fact, and they were charged as such. So no accomplice instruction was needed in this case either. *See Slaughter*, 815 So. 2d at 1135 (¶68) (finding the trial court was within its discretion to refuse a cautionary instruction for a witness who "was not an accomplice" but rather "was indicted for accessory after the fact"); *see also Smothers v. State*, 756 So. 2d 779, 787 (¶23) (Miss. Ct. App. 1999) ("A cautionary instruction about accomplice testimony is not required unless there is an accomplice.").[6]

### III. Sufficiency and Weight of the Evidence

¶51. Finally, Jordan challenges the sufficiency and weight of the evidence. He essentially argues the only testimony the State had was the testimony of Smith and Baker, which was

---

[6] Jordan argues this is a distinction without a difference, citing *Jones v. State*, 381 So. 2d 983, 988 (Miss. 1980). In *Jones*, a capital case, the Mississippi Supreme Court did find, "[a]s a confessed accessory after the fact to the murder with which Jones was charged, [the State's witness] was an accomplice." *Id.* But the witness's status as an accomplice was based on the facts in that case. While Jordan cites *Jones* for the broad proposition that "[a] confessed accessory after the fact is considered an accomplice within the rule that the testimony of an accomplice must be considered with caution," not once in the past thirty-five years has *Jones* ever been cited for that purpose. Instead, the supreme court has maintained the distinction between accomplices and accessories after the fact, finding only accomplices require accomplice instructions. *E.g.*, *Slaughter*, 815 So. 2d at 1135 (¶¶64-68).

Moreover, in *Jones*, despite treating the witness's testimony as that of an accomplice, the supreme court still found no error in the trial court's refusal of an instruction on accomplice testimony. *Jones*, 381 So. 2d at 991. Though the supreme court noted it would not have been "improper to grant an instruction of this nature," the court found, ultimately, "the decision to grant or refuse it rest[ed] within the sound discretion of the trial court." *Id.* (internal citation omitted).

not enough to convict. We disagree. Viewing their testimony—as well as the rest of the evidence—in the light most favorable to the State, as we must, we find the evidence was sufficient and the jury's verdict was not against the overwhelming weight of the evidence.

¶52. While Jordan collapses the two into one argument against the evidence, "sufficiency of the evidence" and "overwhelming weight of the evidence" are not synonymous. Instead, as our supreme court clearly laid out in *Bush v. State*, the two phrases denote two different evidentiary challenges, raised through separate procedural mechanisms. *Bush*, 895 So. 2d 836, 843-45 (¶¶15-19) (Miss. 2005). So we address these issues separately.

### A. Sufficiency of the Evidence

¶53. The sufficiency of the evidence is challenged through a motion for a directed verdict or a motion for a judgment notwithstanding the verdict. *Leslie v. State*, 171 So. 3d 549, 559 (¶38) (Miss. Ct. App. 2015). "When reviewing the sufficiency of the evidence, this court asks 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Bush*, 895 So. 2d at 843 (¶16)).

¶54. The jury found Jordan guilty of two crimes—depraved-heart murder and felon in possession of a firearm. Section 97-3-19(1)(b) defines depraved-heart murder as:

> The killing of a human being without the authority of law by any means or in any manner . . . [w]hen done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual[.]

Both Smith and Baker testified Jordan was waving around a shotgun inside his living room

22

while others were in close proximity. They also both testified Baker shot Coleman. Baker further testified Jordan turned the gun on him to prevent Baker from calling for an ambulance, exhibiting an indifference to Coleman's life.

¶55. Jordan insists the uncorroborated testimony of Smith and Baker was insufficient to support a guilty verdict. But our supreme court has long recognized "that persons may be found guilty on the uncorroborated testimony of a single witness." *Doby v. State*, 532 So. 2d 584, 591 (Miss. 1988) (citations omitted). The State presented *two* witnesses, whose testimony corroborated each other's, along with evidence Jordan tried to intimidate these witnesses once they started cooperating. Moreover, Baker's testimony was corroborated by the fact Coleman's phone stopped emitting a signal at the time Baker said it was burned. And police found a metal barrel used for fires outside Henderson's home. Viewing their testimony in the light most favorable to the State, we find it was sufficient for a rational juror to find Jordan guilty of depraved-heart murder beyond a reasonable doubt.

¶56. This evidence was also sufficient for a rational juror to find Jordan guilty of felon in possession of a firearm. This crime has two elements: (1) the defendant was in possession of a firearm, and (2) the defendant had been convicted of a felony crime. *Cooley v. State*, 14 So. 3d 63, 66 (¶13) (Miss. Ct. App. 2008); Miss. Code Ann. § 97-37-5. Both Smith and Baker testified Jordan went to his bedroom to retrieve a shotgun, which he proceeded to wave around. And Jordan does not contest the fact he had previously been convicted of a felony.

¶57. Therefore, we find no error in the trial court's denial of Jordan's motion for a

judgment notwithstanding the verdict.

### B. Weight of the Evidence

¶58. The weight of the evidence is challenged through a motion for a new trial. *See Dilworth v. State*, 909 So. 2d 731, 737 (¶20) (Miss. 2005). This court "will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush*, 895 So. 2d at 844 (¶18). Like the review of the sufficiency of the evidence, a review of the weight of the evidence views the evidence "in the light most favorable to the verdict." *Id.*

¶59. Jordan insists we must view the testimony of the State's two key witnesses, Smith and Baker, *unfavorably*, given they were charged as accessories after the fact.[7] And when their testimony is weighed against the contradictory testimony by defense witnesses and the lack of forensic evidence, Jordan claims the verdict cannot stand. But our review requires we accept all evidence consistent with the defendant's guilt as true, "together with any reasonable inferences that may be drawn from the evidence." *Crook v. State*, 105 So. 3d 353, 364 (¶33) (Miss. Ct. App. 2012) (quoting *Young v. State*, 891 So. 2d 813, 821 (¶21) (Miss. 2005)). Smith and Baker both testified Jordan shot Coleman. Baker further testified he and Henderson helped Jordan dump the body and burn evidence. And the jury was free to accept their testimony as more credible than Jordan's and his girlfriend's contradictory testimony. *See Grossley v. State*, 127 So. 3d 1143, 1149 (¶21) (Miss. Ct. App. 2013) (citations omitted). After all, the jury had "a much better vantage point to view and assess the tone, mannerisms,

---

[7] *But see* Discussion, § II.B, *supra*.

24

and disposition of witnesses." *King v. State*, 798 So. 2d 1258, 1262 (¶14) (Miss. 2001).

¶60.    Moreover, "the absence of physical evidence does not negate a conviction where there is testimonial evidence." *Brown v. State*, 130 So. 3d 1074, 1082 (¶24) (Miss. 2013) (quoting *Graham v. State*, 812 So. 2d 1150, 1153 (¶9) (Miss. Ct. App. 2002)).  That the State had no forensic evidence was thoroughly explored at trial, along with the State's explanation why—that Jordan had burned his clothes, sold his car, and vacated his rental home, all before the police investigation zeroed in on him.  And it was up to the jury to assess how much weight the forensic evidence, or lack thereof, should be given.

¶61.    "[T]he power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." *Bush*, 895 So. 2d at 844 (¶18) (citation omitted).  This is not one of those cases.  Therefore, we find no error in the trial court's denial of Jordan's motion for a new trial.

¶62.    **THE JUDGMENT OF THE LAUDERDALE COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I, MURDER, AND COUNT IV, FELON IN POSSESSION OF A FIREARM, AND SENTENCE IN COUNT I OF THIRTY-FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH FIVE YEARS SUSPENDED AND THIRTY YEARS TO SERVE, FOLLOWED BY FIVE YEARS' SUPERVISED POSTRELEASE SUPERVISION AND THEN FIVE YEARS' UNSUPERVISED POSTRELEASE SUPERVISION, AND IN COUNT IV OF TEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, TO BE SERVED CONCURRENTLY WITH THE SENTENCE IN COUNT I, IS AFFIRMED.  ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

        **IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON AND JAMES, JJ., CONCUR.  FAIR, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY LEE, C.J., AND ISHEE, J.; WILSON, J., JOINS IN PART.**

        **FAIR, J., DISSENTING:**

25

¶63. The case against Jordan consisted of the accounts of two witnesses – Smith and Baker, both of whom fingered Jordan long after the fact, and only after being arrested themselves. There was no physical evidence implicating Jordan, nor was any murder weapon recovered.

¶64. But at Jordan's trial, the prosecution was allowed to bolster its case through the extensive use of a "rap video" featuring one of Jordan's codefendants, Charles Henderson. The video – in which Jordan played only a bit part – was for a song where the narrators violently threatened, and then killed, an old friend who had turned state's evidence.

¶65. The problem is that the prosecution never proved that the video was intended to threaten the witnesses in this case. It contains no explicit threats against them, and the song contains myriad details that do not match the known facts of the case. It was never even shown *when* the video was made.

¶66. The trial judge allowed the video into evidence without, so far as the record reveals, actually watching it. Instead, he relied on the testimony of a police investigator as to the contents – testimony which, viewed in the best possible light, consisted of errors, exaggerations, and unsubstantiated opinions. At worst, the investigator just lied about what the video showed. Throughout the trial, the prosecution made inflammatory and highly prejudicial claims about the video that turned out to be unsubstantiated.

¶67. The majority would affirm Jordan's conviction based on the assertion of a procedural bar. Although I agree that Jordan's attorney could have objected more forcefully and articulately, he did present all of the necessary arguments to the trial court. With all due respect to the majority, allowing the video and accompanying testimony into evidence was

26

clearly error, and it was preserved for appeal.

¶68.   The admission of the video and the associated, unfounded allegations of the prosecutors denied Jordan a fair trial.  I would reverse his conviction and remand for a new trial.

**The Music Video**

¶69.   I begin with a discussion of the video, to explain why it does not "speak for itself" as a threat against the witnesses in Jordan's trial.  I also do it to rebut numerous false claims about the video's contents which were made by a prosecution witness, and to place Jordan's role in context – he was one of about ten people who contributed to the video, and so far as the proof showed, his involvement was minimal.

¶70.   The video is almost six minutes long and features performances by Henderson and "King Chris."  A third man is credited as the director.  There are five or six extras who are uncredited – Jordan was one of them.  Baker and Smith testified that they "recognized" Henderson, Jordan, and "King Chris," though their testimony differed as to whether his name was Chris King or Chris Randall.  Smith and Baker did not seem to know any of the extras (other than Jordan).

¶71.   The video was shot with a high-definition camera, which at times tracks and pans.  It includes numerous "artsy" shots – the camera tracks across a chain link fence, Henderson appears silhouetted in a doorway, a man (who is probably Jordan) smokes in the dark, Henderson shakes his head sadly in slow motion, etc.  The music and vocals were recorded separately from the video, presumably in a studio, and are dubbed over.  The video seems to

have been assembled from ten or so scenes that were filmed separately and spliced together, back and forth throughout, as well as a number of isolated shots. Henderson is seen wearing three different sets of clothes, suggesting that the filming was done over a period of time. The lip-synching is coordinated with the vocals and music, apparently requiring that the performances at each filming location be scripted out in advance. I emphasize the production values and the number of people involved because they suggest that the video was not created just as a pretext to threaten Smith and Baker.

¶72.    Jordan is just one of the uncredited extras. He appears on screen for a total of about thirty seconds, in only one of the major settings, sitting at a table to Henderson's right. Another extra stands to Jordan's right, doing the same things Jordan does. And most of the time Jordan is at the periphery as the camera focuses on one of the rappers; often only Jordan's arm is visible. When Jordan can be seen, he sits and drinks or smokes, or he mouths the words to the chorus and mimes along. He is also apparently seen in one of the "establishing" shots at the beginning, sitting on a couch in a dark room smoking what appears to be a marijuana cigarette.[8] Some of the other extras have speaking parts in the "short film" at the end, but Jordan does not appear there. As far as I can tell, Jordan is never actually heard on the video.

¶73.    Turning to the lyrics of the song, I do not dispute the description of them as

_____

[8] The majority calls this a "close up shot of Jordan's face," which is an exaggeration. The scene is dimly lit, and while part of Jordan's face is visible, it occupies only about five percent of the screen. The shot lasts about three seconds and is actually part of the opening credits – the words "WATCH IN 1080P HD FOR BEST QUALITY" actually cover Jordan's face for the first second or so, and "A fliFILMS Production" appears and disappears in the center of the screen over the course of the shot.

28

threatening – they are also very profane and offensive. The basic outline fits – the narrators have been betrayed by a friend who turned state's evidence. But otherwise the story differs in important respects.

¶74. The first half or so of the song is performed by Henderson, and King sings the remainder. Both sing in the first person and both relate the same basic events as happening to them[9] – that they were falsely implicated by a friend-turned-police-informant, that the friend thinks they are ignorant of his betrayal, that he shook their hand but would not look them in the eyes, that they have been praying "a hundred times a day." Toward the end of the song, King says he has been praying because he wants to murder the informant.

¶75. Not only does the song not contain explicit threats against Smith or Baker, but it is littered with references to incidents and people that appear to have nothing to do with this case. The encounter where the informant shook the narrators' hands but would not look them in the eye is referred to over and over in the song (both Henderson and King sing about it, and it forms most of the chorus), but no one testified it had actually happened in real life. Henderson refers to some kind of event involving an unnamed woman, and the informant's sister making "statements" (presumably to the police; he makes a gesture like he is writing). He also makes the puzzling complaint that the informant refuses to "speak up on my parents just because I won't speak up on yours." Henderson describes a more intimate relationship

---

[9] Admittedly, King seems to pick up where Henderson left off, suggesting that they are speaking from the perspective of a single individual and that the song was originally written for just one person to perform. The video does not explicitly say who wrote the song, but Henderson appears to have received top billing. The credits said "Gutta G [featuring] King Chris" – Gutta G is presumably Henderson's stage name. At one point, he seems to refer to himself as "Gutta" during the song.

with the informant than was attested in this case: they were "best friends from elementary" school, and Henderson used to give the informant money and food. He suggests that the informant needed charity because he was a poor drug dealer (he had no "hustle skills"). Henderson believes he was betrayed because of "jealousy and envy," which the informant had concealed; King says the informant did it "just to save himself." Henderson refers to the informant's story as "bulls***" and King says he wants to kill the informant without "even asking him why he lied."

¶76.  While it was admitted that Baker and Smith were friends of Henderson and Jordan, and they had all attended the same elementary school, no one testified that any of them had the sort of intimate friendship that the song is about. Neither Smith nor Baker described their friendships with Henderson or Jordan as particularly close, and they seemed to barely know King, much less why he would want to kill them.[10] Smith had lived out of state for seven years, and had by his own admission no contact with Henderson or Jordan since moving away. Baker (who the prosecution seemed to think the song was directed to), when asked how he knew Henderson, stated: "A friend of mine I knew through football and we played football together through elementary and junior high." He said he knew Jordan the same way – from playing football with him. Baker never said or even suggested that Henderson or Jordan was ever his best friend. And Baker had attended high school in Ohio and had only been back in Mississippi for a few years, so it is unlikely he ever received Henderson's

---

[10] Smith said he attended elementary school with King, but he was not sure about the man's name – he thought it was "Chris Randall." Baker seemed to be more confident about the name (Chris King), but he said nothing more than that King was someone he could "identify."

charity. He certainly did not testify to it.

¶77. There is also a physical description of the informant in the song, that he had "duck lips" and "rotten teeth," for what that is worth. If this was intended to describe Smith or Baker, it was never stated on the record. Also, the informant was played by an actor in the video, but, again, there is no record evidence that the actor resembled one of the witnesses.

¶78. Jordan is not even present on screen when the most threatening verses are performed – in fact, most of them are performed by King rather than Henderson. And Jordan does not appear at all in the "murder scene" at the end. From the parts where Jordan appears, it is arguable whether he necessarily knew the song was about a police informant and not just an unspecified betrayal by a friend.[11]

¶79. I would also emphasize that the date the video was recorded was never established. The investigator testified that the copy of the video he saw was uploaded to YouTube in April 2013, which is approximately a year after the first witness implicated Jordan and Henderson. But the date that a video is published is not necessarily the date it was composed or filmed.

¶80. In fact, April 2013 is not even necessarily the first date it was first published. YouTube is a website that, famously, allows anyone to publish videos for public viewing. But there is little to prevent a video from being published more than once; videos on YouTube are frequently published – and republished – by individuals with no connection to the video's creator, who have copied them from elsewhere. *See Viacom Intern. Inc. v.*

---

[11] Jordan certainly knew this *at trial*, after having seen the finished video; but the issue is what Jordan knew at the relevant time – when he participated in the filming.

31

*YouTube Inc.*, 676 F.3d 19, 32 (2d Cir. 2012) (noting that surveys had found that significant percentages – between 80 and 50 percent – of videos on YouTube contained material published or republished without the permission of the copyright holder).

¶81. The fact that someone uploaded a copy of the video to YouTube in April 2013, without more, provides little or no evidence as to when it was filmed – or even when it was first published. For all we know, the video could have been filmed years before. The video is supposed to be relevant because Jordan's decision to participate amounted to a threat against witnesses planning to testify against him, and that evidenced Jordan's consciousness of his own guilt. Regardless of how the video is interpreted, it could not evidence Jordan's consciousness of guilt if it was made before the crime.

*The Investigator's Testimony*

¶82. The video was offered and accepted into evidence during the testimony of a Mississippi Bureau of Investigations investigator, who purportedly established the foundation for admitting it. His testimony is problematic to say the least.

¶83. The investigator's very first statement about the video contains a material, highly prejudicial misstatement of fact. The prosecutor asks (with my emphasis added):

> Q. [I]n your discussions with Mr. Baker and Mr. Smith, did they give you any reason **why they were hesitant to come forward and give you information or give Meridian Police Department information before you actually talked to them?**
>
> A. Yes, sir.
>
> [A defense objection was overruled.]
>
> Q. So did you – were you able to independently verify that they had some

32

reason to be fearful about giving testimony?

A. Yes, sir.

Q. And how did you do that?

A. YouTube video.

Right off the bat, the investigator testifies that the music video was the reason Baker and Smith did not "come forward" sooner – yet, as the State acknowledges, later he testified that it was not published until almost a year after they had implicated Jordan. Neither Smith nor Baker claimed to have seen the video before that. Even if the video had properly been admitted, this misstatement of fact was egregiously prejudicial.

¶84.    The investigator, laying a foundation for the video's introduction into evidence (in the presence of the jury over repeated defense objections) then testifies that the video contains a reenactment of the killing of Aaron Coleman, who Jordan was on trial for murdering. It does not. He goes on to say that the "stars" of the video are Jordan and Henderson, in that order. Again, that is obviously not true; the "stars" are Henderson and his co-rapper, Chris King. Henderson sings about two thirds of the song and King the remainder. Jordan sits next to them at a kitchen table in a few scenes.

¶85.    Then, when asked what Jordan is "doing on the video," the investigator replies that "Mr. Jordan and Mr. Henderson get a witness, which is Mr. Baker, and they get him out in the woods and kill him for ratting on them." Again, this is materially false – even if we assume that the investigator was attempting to convey his interpretation when he said that the victim was Baker, Jordan does not appear at all in the scene he is describing, much less

33

take the lead as he suggests. Then the prosecutor asks whether the video is a threat, and the investigator says, matter of factly, that it is.

¶86. The trial judge then admitted the video into evidence (over numerous objections which I have omitted from the narrative above). And I cannot blame him – had the investigator's testimony been accurate, the video unquestionably would have been admissible. But, again, as far as the record reveals, the trial judge did not watch the video before admitting it into evidence. And for reasons that may have been puzzling at the time, the prosecution chose not to publish the video to the jury during the trial itself (it was provided to them for their deliberations). The prosecution immediately began backtracking from some of the claims the investigator had made, and on appeal the State seems to accept that they are false.

¶87. Still, the prosecutors continued to refer to the music video throughout the trial. Baker and Smith both testified that they had seen it – but after they implicated Jordan, not before. Both interpreted it as a threat, but their subjective interpretations are not evidence of Jordan's consciousness of guilt. Neither said that Jordan or anyone else had expressly used it to threaten them.

¶88. Then each of the defense witnesses was cross-examined about the video, including Jordan himself, who was forced to try to explain the song, verse by verse, despite having nothing to do with writing it. The prosecution even repeatedly insisted that the video showed Jordan "flashing signs" – insinuating that he was a gang member or that there was some other hidden meaning to his gestures during the song. This claim appears to be completely

34

unfounded, as the majority seems to acknowledge. Jordan's gestures just match the lyrics of the song – he points to his eyes ("Can't even look me in the eyes"), displays a middle finger ("F*** all y'all"), and clasps his hands ("A n***a pray a hundred times a day"). If these gestures have any meaning beyond the obvious, the prosecutor failed to establish it. And in closing argument, the prosecutor made the false claim that the song refers to the FBI, which she likened to the Mississippi Bureau of Investigations (MBI) and the investigation of Jordan, when in fact the song mentions neither.

*The Issue Was Preserved*

¶89. Jordan contends on appeal that the video was erroneously admitted as evidence of prior bad acts, under Mississippi Rule of Evidence 404, and that, even if it was admissible under Rule 404(b), its probative value was far outweighed by unfair prejudice under Rule 403. Jordan is manifestly correct on both of these points.

¶90. The State attempts to dodge the issue by asserting a procedural bar: it contends that Jordan failed to cite Rule 404 or challenge the prejudicial impact of the video at trial. It is wrong on this point; the arguments were presented to and addressed by the trial judge.

¶91. As previously noted, the prosecution introduced the video during the testimony of a police investigator. Jordan's initial objection was indeed that the video was irrelevant and that there was no foundation for its admission. He also complained that, although the video had been disclosed in discovery, the prosecutor had never given him any reason to expect that it would be introduced into evidence under the theory that it was a threat against the witnesses.

35

¶92. In response, the prosecutor promised that one of the subsequent witnesses would establish the foundation, and the trial judge seemed to rule that he would take up the issue of admitting the video when that witness testified. The prosecutor then interjected and claimed he could establish a foundation through the police investigator, and Jordan's attorney asked that it be attempted without the jury present. The judge refused, stating, "I can rule," and brought the jury back in. The trial judge then allowed the investigator to testify about the video over another objection. The investigator made numerous false statements of fact in his testimony, as detailed above. Jordan's attorney objected repeatedly before expressly asking for a continuing objection and receiving permission to make a motion on the issue at a later time. And as the testimony continued, he attempted to flesh out his objection, but the prosecutor shut him down by saying he had "about had it with the speaking objections."

¶93. It is true that Jordan's initial arguments only explicitly stated that the evidence was irrelevant, without clearly stating that he was making a Rule 404/403 objection. But that seems to have been implicit, if the evidence was being offered as proof of consciousness of guilt, which is admissible only through Rule 404(b). Unfair prejudice was obvious, and, as the supreme court has stated, a Rule 403 balancing test must be undertaken before admitting all evidence – Rule 403 is the "ultimate filter through which all otherwise admissible evidence must pass." *McKee v. State*, 791 So. 2d 804, 810 (¶22) (Miss. 2001). "Where the specific grounds for objection are apparent from the context, a general objection is sufficient to preserve the error for appeal." *Carter v. State*, 722 So. 2d 1258, 1261-62 (¶13) (Miss. 1998).

¶94.    Regardless, Jordan asked for and received permission to elaborate on his objection later.  And immediately after Baker and Smith had testified and failed to establish the predicate the prosecutor and the investigator promised they would, Jordan unambiguously argued that the video was improperly admitted as evidence of prior bad acts in violation of Rule 404 and that it was improperly allowed in under Rule 403.  He cited *Brooks v. State*, 903 So. 2d 691, 699-700 (¶¶29-35) (Miss. 2005), mentioning the pages and paragraphs, which addresses a Rule 403/404-based challenge to the introduction of the defendant's rap lyrics and tattoos.  Jordan also cited *Hudson v. State*, 977 So. 2d 344, 348 (Miss. Ct. App. 2007), where the same rules were at play.  When the prosecutor was asked for a response, he stated only that he "had already responded to that motion a couple times."  The trial judge then addressed the Rule 403 argument on its merits:

> BY THE COURT: All right. Well, specifically, the Court finds that nobody – nobody has testified or in any way insinuated that Mr. Jordan wrote the lyrics to this – to the video.  He was a star player in the video.  There is testimony and evidence that relates the consensus message that's described in the video to the two witnesses that were testifying against Mr. Jordan.  That's relevant.  That's probative.  So your motion -- your objection to that video is again denied.  It is in evidence, and it will be played before the jury.[12]

The Rule 403 argument was again expressly presented in Jordan's motion for a new trial.  The motion states: "The Court erred by [admitting the YouTube video] over continuous objections . . . without ever having viewed it, based on hearsay, relevance and Rule 403, without weighing the balancing test as to prejudicial effect versus probative value [sic]."

¶95.    Jordan presented both the Rule 404 and Rule 403 arguments during the trial.

---

[12] The video had been admitted into evidence at this point, but not played for the jury.

Respectfully, I cannot join the majority when it concludes that these issues are barred because Jordan never presented them to the trial judge for decision.

*The Video and Other Evidence of Threats Were Erroneously Admitted*

¶96. I do agree that evidence the defendant threatened the witnesses against him is admissible to show consciousness of guilt. *See Mattox v. State*, 243 Miss. 402, 413, 137 So. 2d 920, 923 (1962). I also agree that the video was relevant in the sense that it was "probative of witness intimidation" – meaning that it was some evidence making witness intimidation more likely. But for *any* evidence of witness intimidation to be admissible, the prosecution must prove that witness intimidation actually occurred. Otherwise, the evidence is improperly admitted under Rules 404 and 403.

¶97. Of course it is possible that Jordan had much more involvement in the song than he appeared to, that he and Henderson put the video together to intimidate the witnesses in this case, that they changed the details of the narrative to give themselves plausible deniability, etc., just as the prosecution alleged. That may very well be what happened, but the prosecution failed to prove it.

¶98. It has been speculated that Baker and Smith knew things we do not, and so perhaps their subjective interpretations of the video were supported by real, objective evidence. And perhaps the investigator discovered something in his investigation that he neglected to mention in his testimony at trial. But witnesses are supposed to testify to facts, not conclusions, and the gaps cannot be filled with speculation.

¶99. The State also indulges in a specious probability argument, contending that it is

38

unlikely that Henderson would write a song about his "best friend from elementary" turning him in and then subsequently be implicated in a crime by someone he had attended elementary school with. We have no way of knowing what the odds actually are, since we do not know how many people attended Henderson's elementary school, who Henderson associated with, etc. More importantly, we do not know how many songs Henderson wrote or performed where some detail like "best friend from elementary" could be found. Ironically, the prosecutor addressed the fallacy of cherry-picking when he responded to Jordan's attorney's arguments concerning the victim's own rap songs. Coleman had written lyrics stating that he feared his friends and that his greatest enemy rode around in the passenger seat of his car (Jordan alleged this was supposed to be Baker). He had even written violent rap lyrics threatening unnamed friends who had betrayed him.[13] The prosecutor argued (in rebuttal closing, presumably to avoid the obvious response that the prosecution had done the same thing to Jordan):

> [Jordan's attorney] says, I want you to look at the – he calls it the "rap sheet." That – I assume what he means is the – are the rap lyrics that are written down there. Now, what's the purpose of that? I ask you, what is the purpose of, number one, introducing any of that? I guess he would say, Well, it's because it says somewhere in a big, you know, thick sheet of lyrics – it says something about somebody riding on my right side. But the truth of the matter is, the reason he has put that in there and the reason he's read all of that to you is to try and diminish Aaron Coleman. The reason that he read that to you is so that you would think, well, he wasn't such a nice guy.

¶100. Violence and retribution are spectacularly common themes in rap music. In a survey

---

[13] Among other things, Coleman wrote: "New year[,] new gear [/] fraud n****s disappear [/] no mercy[,] no emotions [/] fake smiles get yo teeth brok[e]n" and "I'm turnin' my back / kept real with [you] n****s but I guess y'all couldn't handle it [/] talk a bunch of j[i]bberish [/] . . . I see hatin' and disloyalty in yo eyes and [you] ain't finna f*** me."

of rap songs from albums with over 1,000,000 sales (not limited to so-called gangster rap), one scholar found themes of violence in 65% of the songs, and violent retaliation in 35%. Charis E. Kubrin, *Gangstas, Thugs, and Hustlas: Identity and the Code of the Street in Rap Music*, 52 Social Problems 360, 369 (2005). After reviewing more than 400 popular songs, she observed: "In cases of snitching or disrespect, violent retaliation is portrayed as punishment and is characterized as an acceptable and appropriate response as part of the street code. In many instances violent retaliation is claimed to be not only appropriate but also obligatory." *Id.* at 374. For snitching in particular, "rappers are not at all reluctant to administer capital punishment." *Id.* "Entire songs may be devoted to warning others about the repercussions of snitching and testifying." *Id.* Other scholars have observed that "[a]rguably, the anti-snitching message has emerged as a central theme within hip-hop." Rachael A. Woldoff & Karen G. Weiss, *Stop Snitchin': Exploring Definitions of The Snitch and Implications for Urban Black Communities*, 17 Journal of Criminal Justice and Popular Culture 184, 190 (2010).

¶101. Commentators have also observed that rap music is especially vulnerable to prosecutorial misuse because jurors often hold it in disregard or are unfamiliar with the genre's conventions. *See, e.g.,* Andrea L. Dennis, *Poetic (In)Justice? Rap Lyrics as Art, Life, and Criminal Evidence*, 31 Colum. J.L. & Arts 1 (2007).

¶102. Introducing evidence of threats requires real proof of threats – because threats against a witness are supposed to be proof of the defendant's consciousness of his own guilt. Evidence of consciousness of guilt amounts to evidence of guilt itself. *McClendon v. State*,

387 So. 2d 112, 115 (Miss. 1980). Courts should not and do not admit such evidence when it is founded on speculation.

¶103. In *United States v. Hayden*, 85 F.3d 153, 159 (4th Cir. 1996), the Fourth Circuit Court of Appeals held that to be admissible, evidence of threats against the witness must be "(1) . . . related to the offense charged and (2) . . . reliable." In *United States v. Smith*, 629 F.2d 650, 651-52 (10th Cir. 1980), the Tenth Circuit noted: "Evidence of threats to a prosecution witness is admissible as showing consciousness of guilt *if a direct connection is established between the defendant and the threat*." (Emphasis added).

¶104. In *State v. Marler*, 498 P.2d 1276, 1281-82 (Idaho 1972), the Idaho Supreme Court reversed a conviction following the admission of threats against a witness over the telephone, where the prosecution failed to prove that the caller really was the defendant. *Id.* In *United States v. Vaulin*, 132 F.3d 898, 900-01 (3d Cir. 1997), the Third Circuit held that threats against the witness, which were never shown to be connected to the defendant, "may have had some highly attenuated, theoretical relevance . . . [but t]he probative value is so minimal and the risk of prejudice so certain that it fails [the Rule 403 balancing test]."

¶105. In *State v. Rogers*, 80 S.E. 620, 620-21 (S.C. 1914), a conviction was reversed after the trial judge admitted into evidence a letter threatening a witness without any proof the defendant had sent it. The South Carolina Supreme Court later summarized the law on the subject as follows: "References to threats or dangers to witnesses are improper unless evidence is offered connecting the defendant with the threats. . . . It would be a 'prostitution of justice' to permit evidence that someone attempted to influence a witness by fear or fright

41

without any evidence that connects the defendant with the tampering." *Mincey v. State*, 444 S. E.2d 510, 511 (S.C. 1994) (citations omitted). The error in *Mincey* – where the prosecutor alleged threats against witnesses without proving them – was so egregious that the reviewing court found defense counsel constitutionally ineffective for failing to object. *Id.*

¶106. I note also that in today's case, one of the witnesses, Smith, was erroneously permitted to testify that he received death threats from a phone number and voice he did not recognize – though I concede that Jordan's objection at trial (to hearsay) was inadequate to preserve the issue for appeal. Nonetheless, the prosecutor compounded the error by linking the anonymous threats with the unsubstantiated allegations regarding the video – their common use of the slang "murk," meaning to murder. As the majority notes, the word is apparently in wide enough use that it has little if any evidentiary value as to the identity of the caller.

¶107. Finally, in *State v. Skinner*, 95 A.3d 236, 238-39 (N.J. 2014), the New Jersey Supreme Court reversed a conviction based on the erroneous admission of song lyrics. It held:

> Fictional forms of inflammatory self-expression, such as poems, musical compositions, and other like writings about bad acts, wrongful acts, or crimes, are not properly evidential unless the writing reveals a strong nexus between the specific details of the artistic composition and the circumstances of the underlying offense for which a person is charged, and the probative value of that evidence outweighs its apparent prejudicial impact.

*Id.*

¶108. The Mississippi Supreme Court seems to have taken the same position as the New Jersey Supreme Court did in *Skinner*. In *Brooks v. State*, 903 So. 2d 691, 700 (¶¶34-35) (Miss. 2005), a case cited by Jordan to the trial court, our supreme court held that rap lyrics were erroneously admitted because of the tenuous connection to the case. Contrary to the

42

prosecutor's claims, the lyrics "[made] no mention of gangs" and "discuss[ed] murder by use of a gun" when the actual murder was carried out with a meat fork. The prosecutor was also erroneously allowed to claim a connection between the murder weapon and the defendant's tattoo of a devil holding a pitchfork. *Id.*

**Conclusion**

¶109. The video was allowed into evidence based on false or misleading testimony, and the prosecution failed to ever establish the proper predicate to introduce it under Rule 404(b). The prosecutor repeatedly claimed, without any evidence, that the video was made after the killing for which Jordan was on trial and that it was a threat against the witnesses. The video is violent and offensive, and it appears to show Jordan associating with drug dealers, using drugs himself, and endorsing violent retribution against witnesses. The prosecutor even used it to insinuate that Jordan was a gang member, that he was sending coded signals, and that he was behind an anonymous threat to one of the witnesses (which was, itself, improperly allowed into evidence). It was capped off by Jordan being unfairly cross-examined about the song's vulgar and violent lyrics, line by line. The cumulative harm of these errors is overwhelming, and the error was preserved for appeal.

¶110. Jordan was tried and convicted solely on the word of two witnesses who did not implicate him until more than a year after Coleman's death, and only after being arrested themselves. Smith's testimony might even be viewed as exculpatory – although he claimed to have seen Jordan with a gun before and after the shot, he did not see the shot itself, and when he looked back after hearing it, Jordan was much too far away from the victim to have

43

inflicted a contact wound, as described by the medical examiner. Even Baker (who did claim to have seen the shot) put Jordan too far away to have inflicted a contact wound, a serious inconsistency given the absence of evidence corroborating Baker's story.

¶111. The prosecution's improper bolstering of its case with the rap video denied Jordan a fair trial. I cannot join the majority in affirming his convictions, and so I dissent.

**LEE, C.J., AND ISHEE, J., JOIN THIS OPINION. WILSON, J., JOINS THIS OPINION IN PART.**